Volume 45

Pages 10844 - 10971

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
   vs.                         )   NO. 3:18-CR-00577-CRB
                               )
MICHAEL RICHARD LYNCH and      )
STEPHEN KEITH CHAMBERLAIN,     )
                               )
          Defendants.          )
_____)

San Francisco, California
Tuesday, June 4, 2024

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiff:
                    PATRICK D. ROBBINS
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue
                    San Francisco, California 94102
               BY:  ROBERT S. LEACH
                    KRISTINA GREEN
                    ADAM A. REEVES
                    ASSISTANT UNITED STATES ATTORNEYS


         (APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:  Rhonda L. Aquilina, No. 9956, RMR, CRR, CRC
              Jennifer Coulthard, No. 14457, RMR, CRR, FCRR
              Official United States Court Reporters


UNITED STATES COURT REPORTERS

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiff:
                          U.S. DEPARTMENT OF JUSTICE
 3                        Antitrust Division
                          450 Golden Gate Avenue, Room 10-0101
 4                        Post Office Box 36046
                          San Francisco, California 94102
 5              BY:   ZACHARY G.F. ABRAHAMSON
                      TRIAL ATTORNEY
 6
     For Defendant Lynch:
 7
                          CLIFFORD CHANCE US LLP
 8                        31 West 52nd Street
                          New York, New York 10019
 9              BY:   CHRISTOPHER MORVILLO, ATTORNEY AT LAW
                      DANIEL SILVER, ATTORNEY AT LAW
10                    CELESTE L. KOELEVELD, ATTORNEY AT LAW

11                        STEPTOE & JOHNSON LLP
                          1330 Connecticut Avenue, NW
12                        Washington, D.C. 20036
                BY:   BRIAN M. HEBERLIG,  ATTORNEY AT LAW
13
                          STEPTOE & JOHNSON
14                        1114 Avenue of the Americas, Floor 45
                          NEW YORK, NY 10036
15              BY:   MICHELLE LEVIN, ATTORNEY AT LAW

16                        STEPTOE & JOHNSON LLP
                          One Market Plaza
17                        Steuart Tower, Suite 1070
                          San Francisco, California 94105
18              BY:   JONATHAN M. BAUM, ATTORNEY AT LAW

19
     For Defendant Chamberlain:
20
                          BIRD, MARELLA, RHOW, LINCENBERG,
21                         DROOKS & NESSIM LLP
                          1875 Century Park East, 23 Floor
22                        Los Angeles, California 90067
                BY:   GARY S. LINCENBERG, ATTORNEY AT LAW
23                    MICHAEL C. LANDMAN, ATTORNEY AT LAW
                      RAY SEILIE, ATTORNEY AT LAW
24

25
```

**UNITED STATES COURT REPORTERS**

1    Tuesday, June 4, 2024 - Volume 45

2                           **I N D E X**

3                                                  **PAGE**  **VOL.**

4    Closing Argument by Mr. Lincenberg:              10847  45
     Rebuttal Closing Argument by Mr. Reeves:         10908  45

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **<u>Tuesday - June 4, 2024</u>**                              **<u>9:23 a.m.</u>** |
| 2 | **<u>P R O C E E D I N G S</u>** |
| 3 | ---o0o--- |
| 4 | (Jurors enter courtroom.) |
| 5 | (Proceedings were heard in the presence of the jury:) |
| 6 | **THE COURT:**  Please be seated.  Let the record reflect |
| 7 | all jurors are present, parties are present. |
| 8 | I understand there was a tie-up on the Bay Bridge this |
| 9 | morning, but thank you very much for persevering and everyone |
| 10 | making it, and now we're ready to proceed. |
| 11 | Mr. Lincenberg. |
| 12 | **MR. LINCENBERG:**  Good morning, Your Honor. |
| 13 | **THE COURT:**  Good morning. |
| 14 | **CLOSING ARGUMENT** |
| 15 | **MR. LINCENBERG:**  Counsel, Steve and Karen, members of |
| 16 | the jury, for almost 3 months we've been sitting here watching |
| 17 | you guys as you listen to all of this evidence wondering how |
| 18 | you could really follow it when snippets of a hundred different |
| 19 | emails about 15 different deals come in, in the space of an |
| 20 | hour, wondering what's relevant, how the defense is going to |
| 21 | respond, what's the significance of this, what does it mean. |
| 22 | And I thought that my colleague, Mr. Leach, following up |
| 23 | on His Honor's instructions, really put it in a nice, succinct |
| 24 | manner in his opening statement. |
| 25 | Mr. Leach said the case is about whether the defendants |

**UNITED STATES COURT REPORTERS**

1    made false statements material to HP in its decision to buy

2    Autonomy.

3         Now, you recall that not one witness from HP testified

4    that Steve Chamberlain made any statements to Autonomy.  You

5    heard from Leo Apotheker.  We didn't even cross-examine him.

6    He didn't even know Mr. Chamberlain.

7         You heard from Andy Johnson; didn't recall any statement

8    that Steve Chamberlain ever made.

9         You heard from Andy Gersh, who wasn't at HP -- he was

10   somebody at KPMG -- he did not recall any specific statement

11   that Mr. Chamberlain made.

12        So the prosecutor built into their cross-examination

13   questions this Andy Kanter and Sushovan Hussain and Steve

14   Chamberlain into all of their questions.  But what he said is I

15   don't recall anything specific that Mr. Chamberlain said, and I

16   relied solely on the CFO.

17        So when it comes to the defense, there's really no reason

18   for us to even call any further witnesses to respond.  What

19   would we say:  We agree with what the Government witnesses

20   said?

21        And you also heard, when they came back and they asked

22   Mr. Gersh:  Well, but Mr. Chamberlain didn't speak up and

23   correct something.

24        Now, put aside that there were no false statements to

25   correct, but you then heard not only was there no duty to speak

1   up, but there were -- there were strict confidentiality

2   considerations that upper management, people like Andy Kanter

3   and Hussain who are running this deal, this potential sale to

4   HP, are being very careful.  And the last thing that the junior

5   guy in the room who is not a part of all of those conversations

6   is going to do is speak up about anything.

7        So, I mean, you even heard that Mr. Chamberlain didn't

8   even know that this sale to HP was going to take place until

9   the end of July, well after the negotiations when he's told

10  that this has taken place.

11       So, if you want to reduce this complicated weeks of

12  discussion about collections and what Mr. Hogenson said and

13  sell-in versus sell-through accounting, none of it is relevant

14  to the question placed before you and in the jury instructions

15  as it pertains to Steve Chamberlain.

16       So I'm going to go through a few of the issues and address

17  them and then come back to this at the end, because I don't

18  want to leave "unresponded" some of the points that the

19  Government raised.

20       But before I do so, I want to get back to something that I

21  mentioned from my opening.  This was a slide that I put up in

22  my opening statement about what the prosecutors did not tell

23  you in their opening.  And really the most important part is

24  this last one that Mr. Chamberlain did not speak with -- it

25  keeps fading out -- made no misrepresentations to HP.  He

 1   didn't even make any representations to HP.

 2        I next want to take a moment and just talk about something

 3   else I mentioned in my opening, which is the story behind the

 4   story.

 5        Now, you're not going to hear from me today really

 6   attacking the credibility of the witnesses.  There's one

 7   witness I'm going to comment on a bit, but frankly, it doesn't

 8   really matter whether he's credible or not, because the

 9   Government's witnesses basically all said that Steve

10   Chamberlain was open and honest and acted in good faith.

11        But I'm revisiting this point because it's sort of

12   relevant whether or not you find a witness reliable or not, it

13   kind of gets to the flavor of what's going on here.  And I

14   think it's important to reset ourselves to the fact that this

15   stuff is going on 15 years ago.

16        And when you go back in the jury room and you're thinking

17   about, all right, well, the Government put in all this stuff

18   and then somebody would read the email and suggest that there

19   was a conversation, I would venture that 90 percent of that

20   nobody remembers.  They're reading from emails, they've been

21   programmed after 10, 15 sessions with the prosecutors.  I mean,

22   think about 15 years ago.  Maybe you were in 9th grade, 8th

23   grade, you know?  Do you remember what you were doing on

24   January 27th of 2009, maybe on the playground or something like

25   that?

```
1                           (Laughter.)

2          I mean, some conversation.  You've got Steve Chamberlain

3    sitting here in Cambridge, the end of the quarter comes.

4    They're dealing with numbers and documents that are flying in.

5    You know, you heard about all these company names.  To

6    Mr. Chamberlain, these are items on a spreadsheet as they come

7    in.  And then people are coming in and:  Well, I remember this

8    or that or that or, you know, blah, blah, blah, blah, and so

9    forth.

10         Keep that in the back of your mind.

11         And I thought the best piece of evidence that really

12   brought that to life was Mr. Hogenson's email to Adam Reeves in

13   anticipation of him testifying.

14         He says:

15             "It's been almost 10 years since I've worked in this

16         area, almost 14 years since these documents were written

17         or exchanged.  My memory on accounting rules is quite

18         limited.  These rules are challenging for someone who

19         works with them professionally every day and close to

20         impossible for anyone that has not thought about them for

21         many years."

22         That's what everybody brings to this table when they come

23   up on the witness stand.  They don't remember this stuff.

24         That's why the Government wants to put in a million emails

25   and then have you speculate about the rest, because it's
```

writing, it's on a screen and you can take a little snippet.

And you're supposed to say, all right, what is the rest of
that email?  Maybe I'll speculate about it, maybe I won't.
There must be something there because they're throwing out a
whole bunch of deals.  That's really what it is.

I thought that Matt Stephan also had a poignant example of
that where, in his direct examination, you recall he said, "Ah,
you know, I wanted to leave Autonomy.  I didn't like what was
going on."

You remember the story of Matt Stephan how three years
after leaving Autonomy this guy is from Australia.  He's in
Washington, D.C., in a hotel room with his wife, and at
8:00 o'clock in the morning an FBI agent knocks on the door and
says:

> "You were the director of revenue recognition" --
> remember that was his title -- "at Autonomy, and we're
> looking into issues involving revenue recognition."

I mean, think about how you would react if you're Matt
Stephan and this is taking place.

Now, different people might react different ways, but his
reaction is he's terrified.  He's not sure he's going to be
able to leave the country.  And it's all of a sudden, yeah, you
know, I thought those deals were bad and so forth and so on.

And I'm not here to dispute, really, the essence of Matt
Stephan's testimony.  I think, for the most part, he's spot on.

```
 1   He just -- it's a little bit make myself look a little better,
 2   yeah, I complained about this and so forth, because he's under
 3   tremendous pressure.  The FBI is knocking at his door.  It's
 4   like if you were in Australia and the Australian Federal Police
 5   knocked on your door, say, remember you worked in England years
 6   ago, and et cetera, et cetera, et cetera.
 7       It scares people.
 8       And you know that his flavor is off because of his own
 9   words from what he said at the time.  When he's leaving, he
10   wasn't leaving because he felt like he was doing something
11   wrong.  He wanted to continue working there even remotely.  He
12   went back to Australia because that's where he's from, his wife
13   wanted to move back.  He says I want to continue working with
14   these guys.  It's been six good years.
15       But he's now influenced by hindsight, by the pressure of
16   the situation.  So he kind of adds a little flavor to things.
17       And I think part of the story behind the story was you
18   recall I had this mantra, I kept asking witnesses, you know,
19   you met with the Government 15, 20 times, Mr. Scott, you know,
20   you liked Steve Chamberlain, you always thought he was an
21   honest guy.  Why wouldn't you meet with me?
22       Do you think that's fair?  You know, when you're thinking
23   about this process, this trial, and you think about the story
24   behind the story, it's witnesses, many of them under pressure.
25   They have cooperation agreements which kind of means they don't
```

1    get charged by anything; don't worry, you're going to be a free

2    man, but, we're still holding over your head if you commit

3    perjury; and remember, we're the guys to decide whether to

4    bring something against you, so when you get on that stand, it

5    better be consistent with the best answers we got from you

6    during our 15, 20 interviews.

7         Defense gets up.  I'm really shooting in the dark.  I'm

8    asking these people:  You dealt with Mr. Chamberlain for seven

9    years.  Did he ever ask you to lie about anything?

10        Honestly, I don't know what their answer is going to be.

11   They've refused to meet with me even though, frankly, they're

12   probably -- their heart is probably in his -- in his shoes

13   because they know and they say:  This guy never lied.  This guy

14   never told me to conceal anything.  That's part of the story

15   behind the story.

16        Now, this indictment has certain references to

17   Mr. Chamberlain, and I'm going to focus on some of the

18   particular references.

19        Now, to start out, there's a conspiracy count.  In the

20   conspiracy count, you heard in the instructions, is conspiracy

21   to violate those wire fraud counts.  And the wire fraud counts

22   are 2 through 15, and they reference different wires.

23        And you'll see on the verdict form that they basically

24   kind of look like this.

25        Now, most of these wires involve meetings with -- where

```
 1   Dr. Lynch maybe met with somebody from HP.  Steve Chamberlain
 2   doesn't even know about them.  A couple of them deal with those
 3   due diligence calls.  We'll deal with those at the end of my
 4   closing argument.
 5        The only one that really mentions SC, Steve Chamberlain,
 6   is this Count 2.  So that deals with this Bank of America deal.
 7   And I'm going to spend a lot of time talking about the Q4 2010
 8   Bank of America deal because the Government has hit hard that
 9   this is improper backdating.
10        Now, before we get into that, I want to discuss this
11   concept of dating, because you've been deluged with it, as the
12   Government tries to persuade you that you should convict my
13   client because of backdating.  Keep in mind that every single
14   witness who testified about this that the Government called --
15   and these are the witnesses that they put up as being
16   credible -- said that dating a document in the following month
17   that is representative of an agreement that is reached in the
18   quarter is legal.  The general counsel of Autonomy, Joel Scott,
19   stated that.  Jonathan Bloomer stated that.  The experts stated
20   that.  The prosecutors said, yep, look to substance over form.
21        Now, it is not the norm --
22        You have a couple of these deals that they've looked
23   through to suggest backdating, some improperly, some properly,
24   and we'll talk about those.  But it is not the norm to be
25   signing the documents a couple days later, and you heard that.
```

```
 1    But it happens, as Mr. Bloomer stated.

 2         And if you think about the process where deals are closing

 3    on December 30th, December 31st, it's not surprising that they

 4    get this agreement and the next day documentation may be

 5    written up on the agreement.

 6         Every witness will tell you it's perfectly legal.

 7         Now, even if it's legal, there's still an issue as to when

 8    the revenue should be recognized, and we'll address that.

 9         The issue, from Mr. Chamberlain's point of view, when it

10    deals with the Bank of America deal, is whether or not he

11    concealed something, failed to disclose something material

12    there, and so we're going to address that.

13         But before I go into the Bank of America deal, I just want

14    to talk about, as Mr. Heberlig used the term, "red herrings,"

15    the red herrings about some of the other stuff that they threw

16    out.

17         And now my clicker is not clicking, so let me just go here

18    to see if I can get it going again.

19         So let's talk about these other deals, because I would

20    suggest to you they have nothing to do with Mr. Chamberlain,

21    but they're thrown out there to kind of smear him and get in

22    your minds this idea of this.

23         So first I would suggest they are allegations generally

24    without evidence.  We'll discuss that.  Mr. Chamberlain was not

25    involved.  By and large, where they've come up with alleged
```

backdating of other deals, it's when, for example, if a deal is
reached on the end of March and on April 1st or 2nd or 3rd, the
documentation comes in.

Now, the documentation comes in -- whether or not the
documentation was actually signed on March 30th or whether it
was signed on April 1st, it's coming over to the finance team
in the following days.

And the people at the finance teams who are receiving
this, generally the director of revenue, which is Matt Stephan
in 2011, Poppy Prentis, and then Antonia Anderson take over
that.  And these are just documents coming in.

And sometimes you have, you know, New Year's Eve and then
the next day is a Saturday or Sunday and holiday, and you might
see something on January 4th or whatever it is.

And it's interesting because most of the documents and
these deals that they put in this category were deals that were
flowing through Matt Stephan.

Ask yourself:  Did the Government ask Matt Stephan whether
or not he understood those deals to be backdated?  I mean, this
is sort of the flavor witness, the guy they put on the stand to
add flavor, who said:  I didn't like, you know, some of these
reseller deals and so forth.

Never asked him.  He's the person you would have asked.

Poppy, who took over -- and I'm going to call her Poppy
because she's Gustafsson -- Prentis Gustafsson -- I'm just

```
1   going to call her Poppy.

2       Brent Hogenson.  Brent Hogenson he was dealing with this

3   Poste Italiane matter, right?  He didn't come in here and

4   suggest that it was backdated.

5       Percy Tejeda, you'll see him on some emails and Corrado

6   Broli and some of these lawyers who they didn't call like Julie

7   Dolan, Jim Crumbacher, Joel Scott with regard to some of these,

8   these are the lawyers who the documents are coming through.

9   They're drafting a lot of the documents.  They had the

10  opportunity to ask these people:  Did you believe this was

11  backdated, rather than leaving it for you to speculate.

12      And they didn't ask it, and I would suggest to you that

13  they knew what to ask and not to ask from their 15, 20

14  interviews of these people, and it's because these people would

15  not have said that they were backdated or that they knew that

16  they were backdated.

17      The last point I have on here is that this is all

18  immaterial to HP.  We're dealing with sales in 2009 and whether

19  or not the $2 million of revenue on a deal came in, in Q3 or

20  Q2.  Remember, there's no dispute that this revenue came in.

21  Who from HP is suggesting that that's pertinent?

22      You know, you have Leo Apotheker say:  I've reviewed

23  basically one document, the key document, the 2010 financial

24  statement.  He doesn't -- you know, he's looking at the revenue

25  for the year, the margins.  It's not a question of whether, in
```

his mind, some deal was on March 30th or April 1st.  It's all
immaterial to this case.

        It's not working, but I'll just go here.

        So the only instance of backdating that somebody testified
to, who would know, because Mr. Egan is driving these deals, is
Stouffer Egan, involving the Prisa transaction.

        And what did Mr. Egan tell you?  He said, "I used my
personal email address, because I didn't think this was right,
the deal was being reached in that next quarter, and we were
backdating it."

        Now, he also said he concealed it from Dr. Lynch, he
testified to that.  And on my cross-examination he said I
concealed it from the Cambridge finance team.

        And pause for a moment and understand why he would conceal
that from the Cambridge finance team.  Because if it was his
goal to get revenue into a quarter earlier, you have to get it
approved by the rev rec people.

        You know, Mr. Egan is not dealing with these people in
England and Cambridge in this back room.  He doesn't know how
they're going to react.  And it's not just Steve Chamberlain.
These documents are coming in to Matt Stephan.  He's the one
who the Prisa deals are -- is coming back here, coming past
him.

        And so the Government wants to put this divide between the
Cambridge finance team and Deloitte.  But if you're Stouffer

```
 1    Egan, there's a reason why you're concealing this from the
 2    Cambridge finance team, because they're going through the rev
 3    rec analysis.  And that's what you told you.
 4         And it would be, frankly, improper, in my opinion, for the
 5    Government to suggest don't believe him when he said he
 6    concealed it.  They put him forward as a credible witness to
 7    you.  Believe him when he said he concealed it from them.
 8         And frankly, what does it tell you when he says, "I used
 9    my personal email address for this" and didn't use his personal
10    email address for any of the other transactions.  Why?
11    Because, in his mind, his understanding there were agreements
12    reached in the quarter that weren't backdated.  That's the
13    significance of that.
14         And when you look at a few of the deals where Steve
15    Chamberlain pops up on the screen, this Poste Italiane deal
16    where there's a contract sent over December 31st, and it gives
17    this language saying that you have until January 4th to decide
18    whether to do it, right?
19         Remember -- I can't imagine anybody would remember this
20    email, but it was, you know, conditional.  You can still decide
21    whether to take it to January 4th.  What does Steve
22    Chamberlain -- how does he respond to the query that comes to
23    him as to whether it can be recognized?  He says, in a word,
24    "No.  Conditional language is conditional."
25         That's how he responds when the question comes to him.
```

1          You have this other MicroLink transaction where the

2    Government tried to tag Mr. Chamberlain as being involved in

3    this.  And in Mr. Leach's closing, he showed you some documents

4    from later in January between different people, but he didn't

5    show you the Exhibit 2791, the January 1st email from

6    Mr. Hussain who is telling Mr. Kanter and Chamberlain and Joel

7    Scott "We received an order from the last quarter."

8          That's the information coming to Mr. Chamberlain.

9          Now, I guarantee he didn't spend more than five seconds on

10   this.  This is going to be a file.  It's going to be contracts

11   that come in to Matt Stephan.  They're going to be gathered

12   together in an orange folder, and then Deloitte is going to

13   swarm on the Cambridge finance team to review these things.

14         And they put on testimony from Alan Rizek then who came in

15   and said, "Well, I received a debtor confirmation letter the

16   week of January 4th, 2010, that did not contain a $2.3 million

17   deal."

18         So he suggested that:  I had some conversation surrounding

19   this with Mr. Chamberlain.  You recall we asked him on

20   cross-examination, you're saying you had this confirmation --

21   this conversation when you got this debtor confirmation, but

22   there's no such debtor confirmation in the record.  He didn't

23   recall anything.

24         So, what did we do?  I had my trusty paralegal go through

25   the records to confirm that.  The Government, honest brokers,

```
 1   stipulated that there was no such document.  There was no such
 2   debtor confirmation.
 3        And it's not surprising that he's mixing apples and
 4   oranges.  This is 14 years ago.
 5        Now, the other thing that Mr. Leach didn't bring up, but
 6   I'm going to address it because I'm afraid we're going to get
 7   sandbagged on it in rebuttal when we have no chance to speak
 8   again, is this red herring about some checks.
 9        So you recall there was some evidence where there's check
10   come in, in July.  And Mr. Scott or Mr. Chamberlain, there's
11   communication saying this was supposed to be dated June 30th.
12   And they kind of want to mix this in and get in your head that
13   this has something to do with backdating.
14        What did Ms. Harris testify to?  And remember, she's in
15   the Cambridge finance office who deals with this.  She says,
16   first of all "We don't recognize revenue on a cash basis."
17        Recall that Autonomy, like most companies, recognize on an
18   accrual basis.  If a deal is reached, it doesn't matter whether
19   the check comes in that day or later.  It's accrued.  That's
20   revenue recognition.
21        So she says, "Check from the customer would be to clear
22   the debtor," their internal records, "not to recognize
23   revenue."
24        Steve Truitt "It's irrelevant what day the check was
25   written."
```

 1          Joel Scott, the general counsel of the company.  You know,

 2    everything is being filtered through the general counsel of the

 3    company.  There's no testimony that this could have been

 4    material to HP.  They didn't even ask Joel Scott about this.

 5          So putting the red herring aside, now let's talk about

 6    Bank of America.  And I'm going to talk about this for quite a

 7    while because you've received all of this different evidence,

 8    and I think we need to look at what it is so that you can

 9    decide whether Steve Chamberlain acted in good faith in his

10    dealings with Deloitte relating to this transaction.

11          So we're going to go through this step by step.

12          So this is the Government's focus.  It's a document which

13    Malcolm Hyson from the customer signs on January 25th that

14    Mr. Truitt emails to Joel Scott.  And they keep putting this

15    back up on the screen because this document was never sent by

16    Steve Chamberlain to Deloitte.  And you should ask yourself

17    why?  But if you review the evidence, the answer is obvious.

18    It was never sent to Steve Chamberlain.

19          So you have this email.  Joel Scott gets this in.  He

20    sends it to Stouffer Egan.  He sends it to Sushovan Hussain.

21    And these are the people who were negotiating the deal with

22    Mr. Truitt.  Scott forwards it to them.  He doesn't forward

23    this to Mr. Chamberlain.  He doesn't have this document to

24    forward.

25          And you recall Mr. Truitt had said the reason why

1    Mr. Hussain wanted the document to be dated December 31st was

2    because there's a maintenance contract that goes with this, and

3    the dates have to match up for that purpose.  He said he didn't

4    have any concern about it.

5        And the key Government witness, the guy who is doing this

6    transaction, tells you there was an agreement reached in

7    December.  This was not backdating.

8        So if you believe the witness that the Government brought

9    in here as their primary witness to talk about these deals with

10   the resellers, if you find him credible, then don't just find

11   him credible on what the Government wants from him.  Find him

12   credible on his key testimony.

13       There are a number of witnesses and people who touched

14   this Bank of America transaction.  The Government called

15   Mr. Egan.  You'll see Mr. Egan said he was told by Mr. Hussain

16   there was an agreement as of December.

17       Mr. Scott, legal to prepare contracts in January, dated

18   the effective date of the contract in December.  Two lawyers,

19   actually, were involved with that, Mr. Guiao as well.

20       Dave Truitt sent a confirmation that the three and a half

21   million was part of the December deal.

22       Mr. Welham and Ms. Anderson, substance over form.  It is

23   proper to recognize revenue on a deal even if every piece of it

24   is not documented in December.

25       And Mr. Bloomer backed that up.

1          On the right-hand side I have a bunch of people who were

2     called in this case but who were pretty central to this.  And

3     I'm going to come back and comment on them, particularly

4     Mr. Mercer, Mr. Flynn and He and Jackson, all of the Deloitte

5     auditors who were all over this because the evidence in this

6     case shows disclosure.  And if you're going to convict my

7     client for something where he made disclosure, don't start

8     speculating that people that they chose not to call, who were

9     dealing with the finance team every day, might have said

10    something consistent with their theory.  That would be

11    improper.

12         So let's go through that transaction.  It begins in

13    December.  And you recall there was direct negotiations going

14    on in December with Bank of America for a 19 and a half million

15    dollar license deal.

16         Now, you'll see some numbers, 21 and a half million,

17    22 million, because there's other pieces of it.  There's this

18    other Zantaz supervision license.  So you'll see some bigger

19    numbers on some of the documents, but it all relates back to

20    this 19 and a half million dollar license that they're trying

21    to sell direct to Bank of America.

22         And as the month goes on, Mr. Hussain comes back around

23    December 30th, says to the guys:  Hey, Bank of America can't

24    get it done right now.  Just can't get the approvals, right?

25         And here's this reference to this 19 and a half million

dollar deal.

Then December 31st comes along and Hussain and Egan go out and they contact some resellers and they close a deal with these resellers.  And you see here Mr. Guiao, an in-house attorney, who is talking about the purchase orders for these resellers relating to Bank of America.

And what comes in with these purchase orders with regard to the 10 and a half million dollars that is supposed to go to DiscoverTech, there's a purchase order for 7, not 10 and a half.  And this is where this whole story begins, at this other 3 and a half million dollars adjustment, amendment, increase that we discuss and all of these discussions that take place in January.

So let's go to January.  And the first key event is January 12th, because there's a meeting on January 12th involving the Deloitte audit partner Nigel Mercer, and the Chief Financial Officer Sushovan Hussain, along with Mr. Chamberlain and Welham, the junior folks there, in which they're discussing this deal.

And you see here it's 21 and a half, this is the 19 and a half plus 2, and it includes a supervise license, and it's openly discussed that it's going through MicroTech, DiscoverTech, Capax.

But the documentation 12 days into the quarter is not complete for the 19 and a half million dollars, and that is

1  what's being discussed as early as January 12th here according

2  to these notes.

3      Let's move forward.  January 13th.  You have two things

4  that happen.  First, there's a Deloitte memo prepared, which

5  discusses this, and then we begin this outstanding items list

6  in which there are requests for full documentation when ready.

7      Now, this outstanding items list is important.  Remember

8  why these are prepared.  There's six, eight, Deloitte auditors

9  in Steve Chamberlain's office, Matt Stephan's office, the

10  Cambridge finance department's office every day, and they go

11  through this list every day.  What documentation don't we have?

12  What's going on with the different deals?

13      And the line item that Alex Jackson, from his

14  conversations every day, is that there is not full

15  documentation.  We do not have a signed agreement as of

16  January 13th relating to this 3 and a half million dollar

17  piece.  Open discussions.  If you want to test those

18  discussions, put Alex Jackson on the stand, but this is

19  evidence that he's documenting what's going on.

20      Let's move up to January 18th.  So January 18th is this

21  day that there's some documents prepared, and Joel Scott

22  testifies that he has a conversation with Sushovan Hussain,

23  because he says:  I want to understand if we're going to be

24  open to Deloitte about this.

25      This is the general counsel in the United States.  It's a

1   pretty important position.  And I would submit to you that Joel

2   Scott was pretty credible as he was going through this.  And he

3   says, "Mr. Hussain indicated that the 3 and a half million

4   dollar piece had been part of the reseller agreement that had

5   been reached on December 31st."

6        He's asking this because they're preparing documentation

7   dated effective as of December 31st, and they're preparing that

8   documentation in January.

9        And remember, Government, in their closing argument, gave

10  you that circle chart of people they're claiming were part of

11  the conspiracy.  They don't claim Joel Scott is part of any

12  conspiracy.  You should believe that this is what he's being

13  told.  And he says he also talks to Steve Chamberlain about

14  this, and Steve Chamberlain is repeating what he's hearing from

15  Sushovan Hussain.

16       So, we move forward and we have documents being sent over,

17  January 18th from Livius Guiao, an attorney preparing the

18  documentation.  Mr. Hussain is assuring him there's going to be

19  open disclosure.

20       And if you pause for a moment, I would suggest one of the

21  reasons why this is so important for Mr. Scott to be checking

22  in with Hussain on this is because Joel Scott has a meeting the

23  next day in San Francisco with the head Deloitte audit partner,

24  Nigel Mercer.  And this is not regular that the audit partner

25  is in the United States and meeting with the general counsel of

the company, right?  And this, recall, is every day on the
outstanding items list.  This is what's in the minds of
Deloitte.

     And this is the slide where Mr. Scott says perfectly legal
to date these documents December 31st.

     And we move forward to this January 19th meeting.

     Now, Mr. Scott didn't recall what was discussed at it.
Not surprising.  It's 14 years ago.  But I would suggest to you
this is a pretty important meeting, because this is the issue
he has just discussed with the Chief Financial Officer.  It's
an issue that is pregnant on the outstanding items list day
after day.  This is the general counsel with the audit partner.
This is another example where I would suggest to you there's
disclosure, because Mr. Scott has just confirmed with
Mr. Hussain:  We're openly disclosing this deal.  There would
be no reason not to discuss the nature of the deal that there's
this 3 and a half million dollars piece.

     Let's go on.  January 24th.  We now see on the outstanding
items list it's not just still waiting for contracts but
supporting documentation for 3 and a half million dollar
revenue consolidation adjustment.

     This is Michael Flynn not called as a witness.  He would
have been a firsthand witness to what that meant and why is it
being discussed.

     But the words themselves tell you what's being discussed,

because what you heard from the witnesses, consolidation
adjustments are big things.  Consolidation adjustments are
adjustments made after these books have been consolidated.  So
these books have been consolidated and the books don't show a 3
and a half million dollar piece, this amendment piece involving
DiscoverTech.

And the witnesses said this gets double heightened
scrutiny when you have consolidation adjustments.  This is the
very definition of disclosure.

And you see it day after day, daily disclosures,
consolidation adjustment.

Ms. Anderson testified to this:

"QUESTION:  Isn't it true that that 3 and a half
million dollar consolidation adjustment was characterized
to Deloitte as a last minute revenue adjustment after
quarter end?

"ANSWER:  Yes.

"QUESTION:  And Deloitte was told this was revenue
from an additional deal?

"ANSWER:  Yes."

So we can debate whether or not that should have been
accounted for in Q4 2010 or Q1 2011.  I don't care what
decision you make on this.  This is Hussain telling Scott:  I'm
going to run it by the auditors, they'll make their decision on
this.  But it was disclosed, and that's all that

1    Mr. Chamberlain's role is, is to make sure that the information

2    gets passed on.

3        But it gets better, because here you see on January 26th

4    Mr. Chamberlain openly writing to Lee Welham:

5            "Just to let you know I now have the 3 and a half

6        million dollar paperwork and will send it to you when

7        online."

8        Let's move forward.  We see that he tells them:

9            "Lee, before you asked I already told them we have an

10       unsigned version."

11       This is January 26th.  The guy who they want to say is

12   concealing or deceiving Deloitte is sending them a document

13   that as of January 26th we still don't have signed paperwork.

14   What could be more open?

15       Steve:

16           "I took the liberty to get the audit confirm signed."

17       Now, Mr. Leach says this was a false statement, that it

18   actually shows the opposite.  I would suggest it's actually a

19   very true statement.  It says:

20           "Since we had not invoiced at year-end," right?

21       They want to suggest it was hidden, that it wasn't

22   invoiced at year-end.  And what's Mr. Chamberlain openly

23   discussing again with Deloitte:

24           "We had an invoice for this 3 and a half million

25       dollars at year-end."

1    What could be more open?

2    And even the language where it's written out that this

3    audit confirmation is -- it was valid and executed not on

4    December 31st but as of December 31st in a letter agreement

5    dated December 31st with an email saying it wasn't invoiced at

6    year-end.

7    Then what else happens on January 26th?  This is now above

8    Steve Chamberlain's head.  There's a meeting between the CFO of

9    Autonomy and the audit partner, Mr. Mercer and Mr. Welham, in

10   London.

11   Remember, London was the corporate headquarters where

12   Autonomy's core management team worked out of in terms of

13   Mr. Hussain, Dr. Lynch, Andy Kanter and the like.

14   And what are they going to discuss?  They're going to

15   discuss the items that -- like consolidation adjustments and

16   the like.

17   Now, Mr. Welham is the only witness here who was there.

18   He didn't recall what was discussed but certainly it didn't

19   raise any issues.  That's their opportunity.  And Steve

20   Chamberlain is not there.

21   January 28th, we move forward, and we now have

22   Mr. Chamberlain writing to both Lee Welham and Mr. Mercer about

23   the outstanding items list:

24       "Hey, I sent you the documentation two days ago, this

25       should come off the outstanding items list.  Paperwork for

```
 1          3 and a half million dollar deal now provided."
 2          You can't assume that Mr. Mercer was unaware of something
 3     when the Government didn't call Mr. Mercer, and it's in black
 4     and white and he's met with Hussain, January 12th.  He met on
 5     January 19th with the U.S. general counsel.  He's meeting again
 6     with Mr. Hussain on January 26th, and it's all over the emails.
 7          And Mercer specifically reviews this.  He's going through
 8     the paperwork on January 28th.  Why?  Because recall,
 9     January 28th was the audit committee meeting.  So he's looking
10     over the consolidation adjustments, other things that might
11     come up.  He shoots a quick email to Lee:  Hey, what was that 3
12     and a half million again.
13          And Lee says:
14               "That's the increase in the BofA deal which went
15          through as a consolidation adjustment."  Further evidence
16          of the openness of the process.
17          Now, you may recall this slide from my opening, in terms
18     of who the decision-makers are.  And the decision-makers on
19     this are the CFO.  He's the one who makes the call.
20          And you saw some examples in this case where he disagreed
21     with Deloitte.  And he can actually say, well, you can put it
22     as a -- you know, a material disagreement or immaterial
23     disagreement, whatever you want, I'm going to push something
24     through.  He makes the call whether to go in on that or not.
25     The auditors approve or reject it, and the board further
```

1    reviews it.  The board being -- the audit committee there being

2    an independent body with a direct relationship to the auditors

3    who also meet in private.

4         Now, all of these witnesses told you that Mr. Chamberlain

5    is not the decision-maker on this.  He can forward the

6    documentation, but eventually if there's something that's a

7    consolidation adjustment or whatever, it's above his head.

8         Even Mr. Hogenson, you may recall, when he decided he was

9    going to send his letter to Dr. Lynch, said I bypassed Steve

10   Chamberlain because Mr. Chamberlain didn't have the authority

11   to do anything about the issues I was raising.

12        You know, there's this bogeyman in this courtroom because

13   the Chief Financial Officer is not in this courtroom.  But it

14   shouldn't let you forget that the Chief Financial Officer is

15   the one who is signing the documents, he's signing the

16   management representation letters, and making these decisions.

17        And it's all done under heightened scrutiny during this

18   time period.  Recall from my opening statement when I put this

19   slide up because after Hogenson raises his issues, there's

20   further heightened scrutiny.

21        And, boy, if there's one deal that's going to get

22   heightened scrutiny, it's a $20 million sale to resellers after

23   Hogenson's complaints that's in Q4 2010, just a few months

24   later, where some of documentation on 3 and a half million

25   dollars is not even signed until January.  There's no deal that

got more heightened scrutiny than this.

And remember, Mercer is the guy who rejected some of what Mr. Hussain argued for in terms of assigning some of the hardware costs to sales and marketing and the like when he came in.

And so you see Deloitte's papers on this.  January 28th, applying heightened scrutiny, Deloitte agrees with this adjustment.  They note the delivery for the software took place in December.  They have these confirmations and the like, all way above Steve Chamberlain's paygrade at this stage.

Mr. Bloomer talked to you about these January 28th audit committee meetings.  Basically what he said is material issues came up.

Nobody recalls -- well, Mr. Bloomer is the witness and Welham, I guess, was there.  They don't recall this even coming up.  Not surprising, because, frankly, it was immaterial.  You had a 2010 year-end financial statement where the materiality threshold was $22 million.  Now, they're going to look at any consolidation adjustment quite extensively, but this is a blip.

So if you go back and you compare what was told to Mr. Chamberlain, 19 and a half million dollar deal through resellers.  That's what was told to Deloitte.

Delivery in December, Deloitte told delivery in December.

Three and a half million dollars consolidation adjustment. That's what's told to Deloitte.

1      Paperwork not signed until late January, that's what's

2   told to Deloitte.

3      That's the very definition of disclosure.

4      Now, I don't have to prove my client's innocence in his

5   full disclosure on this, but we just did it.

6      And the prosecutor's smoking gun here was when they had

7   Joel Scott say -- you know what? -- it gave me comfort that in

8   February, March, I had a conversation with Steve Chamberlain

9   and he said the entire Bank of America deal was taken in Q1 of

10  2011.  Do you remember that testimony?

11     And do you remember what the response was?  The response

12  was that the Government had never shown him the documents in

13  his preparation that related to all of the disclosures that

14  made clear to him that his memory wasn't correct on that.

15     And you can see how, years later, interview after

16  interview, and you're going down this path and you're not shown

17  any documents to the contrary, it's not surprising that one's

18  memory can be off or get selective or whatever.

19     And I showed a couple of emails, the key one being this

20  March 3rd email from Steve Chamberlain to Joel Scott.  This is

21  in connection with this deal which BofA has now agreed to take

22  through the resellers and so forth, right?  We now have this

23  end user agreeing that the 3 and a half million dollars was

24  accrued at the end of Q4 2010.

25     And he looked at this and I said, you know, is it possible

1    that your memory is off a bit?  And Mr. Scott, to his credit,

2    said, yeah, sure looks -- it's pretty clear this is an email

3    from Steve talking about the deal closing in Q4.  Maybe my

4    memory is wrong.

5         That's a little bit of the story behind the story, how

6    when you go back in the jury room and you've got these millions

7    of deals and you want to start speculating.  You know, this

8    evidence matters, and it matters to approach, when the

9    Government is asking you to speculate to things where there

10   aren't documents, approach it with more than a professional

11   skepticism that Deloitte approached it.  Approach it

12   remembering that the burden is in this case.

13        And that was corroborated again by the 2010 annual report

14   which we showed Mr. Scott, who agreed, yeah, all right, I

15   guess, you know, maybe my memory is off.  Clearly I saw the

16   annual report.  Clearly the Bank of America deal was recognized

17   in 2010.

18        And I mentioned this earlier, this is what Mr. Bloomer,

19   Anderson, Welham, their expert Mr. Brice, Mr. Taylor said "You

20   look to substance over form on this."

21        It's not the deal that Steve Chamberlain likes.  These are

22   the type of deals that get him and Matt Stephan upset.  You got

23   some deal coming in and it doesn't have all the paperwork and

24   Deloitte every day has this on their outstanding items list as

25   you're waiting for the paperwork, you're working long hours.

1    You got a million things on your plate at this

2    end-of-the-quarter time period.  It's not the deal he likes,

3    but what's his job?  Openly disclose it.

4        If Hussain wants to make an argument, if Deloitte is --

5    believes that it should be recognized that there was an

6    agreement in place, document it later, just openly disclose it.

7        And that's even corroborated by an email that has nothing

8    to do with this but I thought was pretty telling that came up

9    in the cross-examination of Matt Stephan.  And this was when

10   Matt Stephan was a Deloitte auditor, right?

11       So this is Deloitte, Matt Stephan at Deloitte writing to

12   Steve and copying Lee Welham talking about a deal from years

13   ago that -- that was -- where there was -- where there was

14   documentation later on.  And perfectly okay, no evidence to the

15   contrary.  That was Mr. Stephan's testimony.

16       So if you take a step back and you say the only deal where

17   there's evidence of backdating was Prisa, it was concealed from

18   Mr. Chamberlain, and kind of interesting that in Mr. Leach's

19   closing on that Prisa deal he came up with some email that had

20   nothing to do with the dating of this and said Mr. Chamberlain

21   knows that Prisa, a Spanish media company, has no desire for

22   the EDD software that's in it.  Where did that come from?

23   You've heard no testimony about this.  Nobody called anybody

24   from Prisa.  There's no proof of that.

25       Prisa, to Mr. Chamberlain, was a line item.  It was a

customer that shows up on a spreadsheet that Mr. Stephan is
dealing with and may come across Steve's desk for something
further.  No evidence of that.

And with regard to Bank of America, complete disclosure of
when the documents are being signed.  This is not something
that's going to somebody's personal email.  This is something
that's going straight to Deloitte.  So I spent a lot of time on
that, because they tried to hit hard, and you need to see all
of the evidence of disclosure.

So let's talk a little bit about the rest of the case.

First of all, the Cambridge finance team is responsible
for certain things and not responsible for other things.  And
what they're not responsible for are the things with analyst
and disclosures to the market of different things and
commercial rationale and the like, a lot of the things that
Mr. Heberlig covered so well in his closing.  They're not
responsible for the CFO's judgment calls, management rep
letters, disclosures to HP, things like that.  Those are being
dealt with at a much higher level, and there's no evidence
relating to Mr. Chamberlain or his finance team in this regard.

They are responsible for a number of things:  Gathering
materials to put in the orange folders, collating and
consolidating numbers, responding to questions that auditors
have from them.  What's the commercial rationale?  Well, you
need to talk to the chief technology officer or you need to

```
 1   talk to the businessman on that, directing them to the right
 2   person, and a whole host of other things, like collections and
 3   taxes and integrating companies and transfer pricing and the
 4   like.
 5       And the evidence shows that in that regard my picture of
 6   Mr. Chamberlain just the other day standing at the bus stop
 7   waiting to come to court performing his job in good faith.
 8       And the Court instructed you that good faith is a complete
 9   defense.  An honest mistake in judgment does not rise to the
10   level of intent to defraud.  You can question the judgments
11   that Mr. Hussain made all you want.  It's not our burden to
12   prove good faith.  It's the Government's burden to prove lack
13   of good faith.
14       And here, this is really the central issue with
15   Mr. Chamberlain.  And if you take a step back and you say:  Why
16   did we ask all of these witnesses about whether or not
17   Mr. Chamberlain acted in good faith.  Again, frankly, not
18   knowing the answer, is because it's a complete defense.  And
19   these were people who dealt with him for years.
20       And it started with talking about this culture of openness
21   in this small office, and Ms. Harris:
22           ▪QUESTION:  Did the open plan nature of the office
23       have an effect on the daily work culture in your
24       department?
25           ▪ANSWER:  Just a very open -- just a very
```

```
1        straightforward culture.  Everyone sort of knew what was
2        going on.  There was -- you know, you could hear what
3        everyone else was doing.  If you needed to jump in because
4        somebody had got something wrong or whatever, you could,
5        you know, just everyone was there to do that."
6            MR. LINCENBERG:  This is the controller at a certain
7   point.  These are the people who worked with Mr. Chamberlain on
8   a daily basis.
9        You saw emails of Steve telling his team "Forward the
10  debtor confirmation letters without modification to Deloitte."
11       In this case the debtor had listed something that was
12  unhelpful to rev rec.  Steve said forward it anyway.  That's
13  encouraging transparency.
14       All of these witnesses, eight of whom were called by the
15  Government, testifying to Mr. Chamberlain's good faith.
16       Now, you know, Dr. Lynch's testimony was important to
17  respond to witnesses like Alex Marshall and others who
18  apparently had made what was I think proven to be false claims
19  against him.  Here there's no witness who made any statement at
20  all that Steve Chamberlain acted in bad faith.
21       So when you're a defense lawyer and you're saying, well,
22  do I need to put on any additional witnesses besides the people
23  we had called in January in London to refute this, it's pretty
24  clear.  What's Steve Chamberlain going to do, say:  Yep, I
25  agree with what they said, they acted in good faith.
```

 1    And despite these people being -- some of them being tied

 2   in to assisting the Government, refusing to meet and I'm

 3   swinging in the dark, this is what they all testified to.

 4    And these three people are particularly important because

 5   these are people who worked as auditors at Deloitte.

 6    Now, think about it.  If the Government's theory is

 7   correct, it's that Steve Chamberlain lied to Deloitte.  He lied

 8   to these people and then he's going to go hiring them to bring

 9   him in to work with him?  It makes no sense.  And it makes no

10   sense because it's not accurate.

11    And Matt Stephan, despite all of the flavor that he gave,

12   talking about deals he didn't like and so forth, was open and

13   honest.  We found him to be a person of integrity, a person who

14   was open with you, and a person who was open with the auditors.

15   That's their star witness telling you that Steve Chamberlain

16   acts in good faith and the Judge telling you that good faith is

17   a complete defense.

18    The Government can't have it both ways.  If they're

19   putting forward Matt Stephan as a witness, accept his

20   testimony, because he dealt with Mr. Chamberlain for years.

21   And they may not have liked all of the deals or having to deal

22   with these issues that would come up later, but he acted in

23   good faith.

24        "QUESTION:  Can you describe the level of cooperation

25       during that time period that Deloitte received from

1    Mr. Chamberlain?

2        "ANSWER:  I -- my experience was that he was very

3    responsive and very open, and that was exampled by the

4    fact that when we asked for copies of books and records,

5    we were directed to the same books and records that he

6    himself referred to, and we were freely able to access

7    them when we wanted."

8    That's Poppy when she was an auditor, and then Poppy when

9    she was a revenue director.  Steve was open and honest.  And

10   Poppy discussing it further the entire time she worked with

11   Mr. Chamberlain, open and honest.  Never felt pressured to make

12   any false accounting entry.

13   Ms. Harris:

14       "QUESTION:  Did Mr. Chamberlain ever ask you to hide

15   anything from Deloitte?

16       "ANSWER:  No."

17   These are the people who worked with him on a daily basis,

18   and they were not cross-examined on this by Mr. Reeves during

19   these depositions.  He didn't challenge the truthfulness of

20   their testimony.

21   Marc Geall:

22       "QUESTION:  Let me ask you, in the two or so years

23   that you worked at Autonomy, did you have any dealings

24   ever with Mr. Chamberlain where you felt that he was

25   dishonest?

1              **"ANSWER:**  No, I didn't."

2      You move on.  Lee Welham:

3              **"QUESTION:**  And you would say, based on the

4      information you knew, all members of the Autonomy team,

5      not just Steve but Matt Stephan and Poppy and the people

6      who he worked with, open and honest in good faith."

7      Joel Scott:  "Honest in his dealings, straightforward,

8  performed his job in good faith."

9      Antonia Anderson:  "Mr. Chamberlain was always open and

10 honest, somebody who performed his job in good faith.  And when

11 he offered you a job, you jumped at the opportunity because

12 this is the type of person who you wanted to work with."

13         Ganesh, who was in the United States, found Steve to be

14 somebody of integrity, a person who was open and a person who

15 was also open with the auditors, and on and on.

16         Which witnesses came in here and said that Steve

17 Chamberlain lied to them?  Zero.  I mean, take a step back.

18 I've been practicing law for 39 years.  I sat on this side of

19 the courtroom for a while (indicating), I've sat on this side

20 of the courtroom (indicating) for a long time, and I can't

21 remember a case in 39 years where every Government witness,

22 people who worked with him on a daily basis for years came in

23 and said:  This guy was always open and honest.

24         It's not simply, as Mr. Leach says in his closing, we'll

25 accept that Steve Chamberlain was a good guy.  This has nothing

```
 1    to do with whether you're a good guy.  This is a case where
 2    they want you to convict him of a crime where every one of
 3    their witnesses that they proffered said he was open and
 4    honest.
 5        I'm going to talk briefly about the reseller deals because
 6    they were covered by Mr. Heberlig at great length.  Deloitte
 7    reviewed them and approved them with the same information as
 8    Steve Chamberlain, and they were analyzed in realtime.  That's
 9    when you review the documentation.
10        Their case, half of it, is coming up with some document
11    later on about whether or not somebody was involved in a later
12    negotiation direct with the reseller, none of which information
13    is being reviewed in realtime.
14        Percy Tejeda.  They spent hours with Percy Tejeda on the
15    witness stand for some reason supporting Mr. Hogenson in his
16    allegations about sell in versus sell through.  And what did he
17    say at the end of the day?  He wasn't even aware that
18    Autonomy's policy, or at least as he sits here today, 14 years
19    later, was sell in.  I mean, what are we doing?  What does this
20    have to do with representations made to HP?
21        And Mr. Hogenson's questions, I submit, are important for
22    Mr. Chamberlain's defense because here accounting questions are
23    being examined and reexamined not only by skeptical auditors
24    with all of their independent partners and this and that, but
25    now you have a whistleblower who is looking at this accounting,
```

1  right?

2      And they find it's perfectly acceptable.  So you know,

3  Mr. Stephan says:  I didn't like some of the accounting.  I

4  talked to Steve Chamberlain, you know, we didn't -- this -- you

5  know, this was just a lot of work having to deal with hardware,

6  you know, deliveries and what evidence comes in and more

7  documents are coming in, and who knows this or that.  Do you

8  remember that testimony?  Accept it.  It's a pain, all of this

9  stuff coming in.

10      But the auditors have not only -- are not only approving

11  these, approving the judgment calls that Hussain is making, but

12  they're reexamining it under heightened scrutiny and approve it

13  again.

14      If you're Mr. Chamberlain, how does that sit in terms of

15  your mindset?  Well, there's some other witnesses who gave a

16  pretty good example of how that would sit.

17      Do you remember Mr. Scott talking about how he took

18  comfort from the fact that Deloitte had reviewed things.  It

19  makes sense that you would take comfort from that, same with

20  Mr. Chamberlain.

21      Brent Hogenson.  Do you remember he said, look, I wanted

22  to just have the auditors review these decisions, make sure

23  they're proper, because if they find they're proper, I will

24  take comfort in that.

25      Well, why shouldn't Steve Chamberlain also take the same

1    comfort in that?

2        You can question whether or not a deal should close or

3    this or that, but when you're supplying the documentation, the

4    auditors are signing off on it and then they double review it,

5    they're saying these are proper.  And they were proper.

6        And then on the issues where Mr. Egan is suggesting

7    whether it's dealing with his Prisa deal or his side

8    conversations, he testified "I concealed that from

9    Mr. Chamberlain."  Not surprising if his goal -- and it's a big

10   "if," but if his goal is to try to get a deal recognized, then

11   he's got to get it past the rev rec people.  So if these side

12   conversations meant something, he's not going to tell them to

13   the Cambridge finance team.

14       John Baiocco said the same.  And you can see how Steve

15   Chamberlain is doing his job, harassing customers, these

16   resellers to -- pressing them for payment.

17       You know, Baiocco complains about that to other people:

18   Hey, why is Chamberlain pushing for this?  It's because it's

19   concealed from Mr. Chamberlain.

20       I'm not going to talk about managerial involvement because

21   Mr. Heberlig covered it at great length, but it's a highly

22   judgmental area.  There's complete disclosure on this to

23   Deloitte.

24       Steve is affirmatively telling Deloitte that Autonomy

25   remains involved in these deals and Mr. Knights, the audit

1  partner at the time, is talking about how I would expect that

2  both Eli Lilly and Morgan Stanley will go direct with Autonomy.

3  From talking to Steve he admits that what I have described

4  above may well happen.

5      So if they want to suggest that there's a problem with

6  ongoing managerial involvement and how it was handled, knock

7  yourself out.  This is all openly discussed with Deloitte.

8  They can make a decision on that.  Steve is telling them

9  exactly what's taking place.  The decisions can be made.

10      Purchases from resellers.  Mr. Egan, you know, remember

11  they went back and forth as to really whether there was any

12  pretext, whether there was a pretext in his emails, what did he

13  say.  He said I didn't disclose that to Steve.  This deal dealt

14  with this Capax EDD servicing in which you have invoices for

15  servicing.  The documents that go to Mr. Chamberlain are those

16  invoices or Mr. Chamberlain, they really went to his office.

17      Nobody is telling him this -- if it is a pretext, you're

18  certainly not going to tell the people that you're trying to

19  put something past, if that's what's happening.

20      And Mr. Baiocco admitted to the same.  The documents --

21  from the documents you're sending to the finance team are, you

22  know, reasonable for them to believe you're actually performing

23  the work.

24      MicroLink acquisition, just a couple of quick points.

25  Mr. Chamberlain has nothing to do with the decision that's made

1    by management whether to buy MicroLink.  The accounting is done

2    correctly.

3        Dave Truitt says:  The reason why we didn't put certain

4    purchases from Autonomy on our books was because we've got this

5    deal with the Government where we can get more business for

6    certain small business set asides, and we don't want these

7    large numbers on the books.  Right?  That has nothing to do

8    with Mr. Chamberlain.  He also said the debts were clearly

9    real.  We understand we owed them the money.

10        So Alan Rizek comes in and when Matt Stephan gets involved

11    and Steve Chamberlain get involved and they get these books as

12    part of this consolidation process, they say:  These need to be

13    on the books.  You need to be compliant with the U.S. laws with

14    MicroLink because they're in the United States, and these real

15    debts have to be disclosed.

16        And Dave Truitt saying consider MicroLink on the hook for

17    all this.

18        So let's talk for a moment about what Mr. Hussain is doing

19    in this post-end-of-quarter period.  Mr. Hussain is an officer

20    of a public company.  Very different position than people in

21    the back room who are crunching numbers and putting together

22    sheets and orange folders.  There's a lot that he has to do in

23    that post-end-of-quarter period, and one of them is preparing

24    for earnings calls.

25        And you see Mr. Hussain in this period where the

```
 1    Government says:  Look, here's an email to Steve Chamberlain

 2    saying we're looking for $2 million more.

 3         But what did the witnesses testify to?  One of the things

 4    they testified to is they had just purchased a company called

 5    Interwoven.  Interwoven had policies with deferrals from sales

 6    in prior years that at some point has to be recognized.

 7         So Hussain is saying go look, see what deferred revenue

 8    needs to be recognized.  And Mr. Hussain says that's what we

 9    did.

10         Whether Mr. Hussain's motive was to hit a number or not is

11    not relevant to us.  We're just told to go search for deferred

12    revenue that can be recognized.  He says perfectly normal

13    process.

14         Ganesh:  Perfectly normal process.

15         And then they come up with an example in April of 2011

16    where there's conversations among management team, Mr. Hussain,

17    Dr. Lynch, because they're looking at the numbers because,

18    recall, they have to do a pre-earnings release if the numbers

19    are off.

20         Upper management needs to know where the numbers are

21    coming in, and information is still flowing in.  So what

22    happens the next day?  Hussain sends an email saying I need you

23    guys to do the math on various things that may happen.  And the

24    Government deems this email to be pernicious.  So I asked about

25    it when we deposed Ms. Gustafsson.  She said perfectly normal
```

```
1    to do the math calculations on this when requested by Hussain.

2    The CFO needs as much context as possible for accounting

3    judgments, for pre-earnings releases and so forth.

4         Ms. Harris said the same.

5         Neither were cross-examined about this.

6            "QUESTION:  What is Mr. Chamberlain asking you to do

7         here?

8            "ANSWER:  So Sushovan likes to, quite a lot, of just

9         sort of like what-if analysis; well, what if that

10        happened, what if that happened, what if that happened;

11        can you run the numbers if that happened, just a lot of --

12        can you just see what would that look like, what would

13        that look like?

14           "QUESTION:  And whatever the ultimate numbers would

15        show for Prisa or BBC or hardware sales, those would all

16        be reviewed by Deloitte?

17           "ANSWER:  Yes."

18        And in that deposition of Ms. Gustafsson, of Poppy, I

19   asked her about all three of these different options you're

20   looking at.  Because remember, at the end of the day the

21   numbers, these weren't the numbers.  These were calculations on

22   different potential numbers.

23        And she said:  Yeah, hardware sales, documents are still

24   coming in.  One of these deals, it's unclear whether Deloitte

25   is going to agree that the customer has accepted things.  Legal
```

1    is going to get involved.  There's different options out there,

2    and the core management is trying to figure out what's going

3    on.

4         You also see this type of analysis being done at Deloitte

5    where they reviewed different potential landing areas on how

6    things may come through.  That's just perfectly normal process

7    of what you go through.

8         Now, the second area where the Government got into this

9    math calculations was this January 14th, 2011 calculation that

10   Mr. Hussain asked Mr. Chamberlain to perform about different

11   gross margins.

12        And this is important, because what's happening here, you

13   may recall, is there had been a debate in prior quarters as to

14   whether or not some of the cost for these loss-making hardware

15   sales should be attributed to sales and marketing or whether

16   all of it should be in costs of goods sold.

17        And early on Deloitte had accepted that some of it should

18   be in sales and marketing, that's fine.  Later they said nope.

19   And we're in January of 2011, and the prosecutors say

20   Mr. Hussain is pushing to try to get his revenue numbers up.

21   Maybe.  Maybe he is.  And one of the arguments he's going to

22   make to the auditors is that we really think you're wrong in

23   not allowing some of this cost to go to sales and marketing.

24   It's a judgment area.  If he wants to make the argument, he can

25   knock himself out and make the argument.

1          Mr. Bloomer tells you it's normal to look at the math and

2   not unusual for management to put forward:  Can we do this, and

3   you have debate, and sometimes management wins and sometimes

4   they don't win.

5          And there's this discussion about whether this

6   $4.4 million adjustment should be made that Mr. Hussain is

7   seeking.  Now, this was another example of where the prosecutor

8   in his closing sort of tries to lump Steve in on things,

9   because Mr. Bloomer had testified:

10              "QUESTION:  Do you remember in this fourth quarter

11         audit committee a discussion around an additional

12         4.4 million that Mr. Hussain was seeking?

13              "ANSWER:  Yes."

14         It's not on your screen, it's at transcript 9523.

15         But Mr. Leach decides he's going to kind of lump Steve in

16   here.  They did not agree to this, and yet Mr. Hussain and

17   Mr. Chamberlain did it anyways.

18         All of the testimony is that this is something that Mr.

19   Hussain is pursuing.  Is he asking Mr. Chamberlain to do the

20   math on some calculations?  Yes.  But he's the CFO who goes to

21   the audit committee meeting and gets an up or down on it.  And

22   frankly, he's entitled to do that.  And Deloitte can reject it.

23   In this case Deloitte rejected it.

24         But there's nothing pernicious about Steve Chamberlain

25   responding to his boss and doing some calculations on how the

1   math would come out.  Mr. Bloomer is telling you that's what

2   happens.  You would expect the CFO to be asking questions of

3   his finance team, to update them.

4       I'm going to talk a little bit about hardware delivery,

5   not because it's an important issue here, but because the

6   Government wants to tag Mr. Chamberlain with doing something

7   wrong here, and the evidence proved the opposite.

8       So first of all, these hardware delivery issues are not

9   material, because whether or not some of the hardware was

10  delivered on June 30th or July 1st in 2009 or 2010, or

11  wherever, may make a difference in terms of what quarter it

12  should be recognized.  It has nothing to do with

13  representations or what HP is relying on.  And Mr. Apotheker

14  testified to that.  And Mr. Brice is just saying this is just

15  whether or not the number for Q2 would be lower and then it

16  would be higher in Q3 or the like.

17      And how does this hardware delivery evidence work?

18  Information is obtained from the field, it's disclosed to

19  Deloitte, and is basically handled by Matt Stephan and Poppy.

20  And you saw Matt Stephan being involved in gathering this

21  information.  And I'm going to go through a couple of quick

22  examples.

23      Morgan Stanley, a Q2 hardware delivery.  Government's

24  story:  Autonomy concealed that Morgan Stanley intended to

25  purchase HDS Hitachi hardware, and that there was no proof of

```
1    delivery.
2        Now, this is not a wire count fraud in the indictment.
3    Now let's discuss it.
4        Ms. Anderson on direct testimony:
5            "QUESTION:  At any point during the course of your
6        audit was that disclosed to you?"
7            She says "No."
8        The Government's smoking gun.  Well, why wasn't it
9    disclosed to her, because she had nothing to do with this deal.
10   So we come up and we show the email that it was disclosed to
11   Murray.  She looks at it and she says, "It was disclosed to
12   Deloitte."
13       Ms. Anderson, about these pro forma invoices:
14           "QUESTION:  Were these provided?
15           "ANSWER:  No.
16           "QUESTION:  Was this evidence that was available to
17       you at the time?
18           "ANSWER:  No."
19       What does she say on cross?
20           "QUESTION:  Mr. Chamberlain tells Lee Welham and you
21       and Richard Knights that we have pro forma invoices?
22           "ANSWER:  Yes.
23           "QUESTION:  And so if Mr. Welham or you or
24       Mr. Knights wanted to actually see the pro forma invoices
25       you could have respond and said could we see them?
```

```
 1          "ANSWER:  Right."

 2      Another example where they called one witness who just has

 3  nothing to do with the transaction, but it's disclosed to

 4  others there.

 5      Deloitte is perfectly aware that this proof of delivery,

 6  what the nature of the imperfect proof of delivery is.

 7      And so they require on this deal a management

 8  representation letter.  And read it, it says:

 9          "I have talked to Steve.  As Sushovan suggested to

10      Richard, EMC are unable to supply any fully approved

11      documentation.  Autonomy's point is that Morgan Stanley

12      have accepted the goods as per this email -- email chains

13      forwarded by Steve and then approved for payment.  As a

14      result, we should document the facts we have --"

15      Imperfect facts.  Mr. Chamberlain is open to that.

16          "-- and add a rep letter."

17      And the prosecutor says, ah, Mr. Chamberlain forwarded

18  that rep letter.  Oh, you know, it could have been forwarded by

19  a secretary.

20      A management rep letter is a big deal.  It's basically

21  Deloitte saying we're not going to accept the evidence that

22  Steve Chamberlain has openly shown us as proof of delivery.  If

23  you want us to consider it further, you, the CFO, the officer

24  of the company, have to sign onto it.  Above his pay grade.

25      Let's look at VMS.  Government's story:  Hardware was not
```

1    repurposed.

2         Evidence:  CFO asks engineers whether repurposing is

3    possible, engineers identify hardware to be repurposed, and

4    Deloitte works with Matt Stephan to review the work of the

5    engineers.

6         And this is all in the evidence before you of what's

7    happening here, that the -- Deloitte is relying on

8    conversations with Pete Menell, not with Steve Chamberlain,

9    about this issue, and Matt Stephan is handling it.  And

10   Mr. Goodfellow testifies:

11        **"QUESTION:** As far as the information that you were

12        asked by Matt Stephan to provide, was it accurate?

13        **"ANSWER:**  Yes."

14   He conceded he did not tell the finance department that it

15   might not have been technically feasible to repurpose it.

16        Well, you can hold that against Autonomy or say that there

17   should have been an adjustment in the accounting.  But if

18   you're looking at whether anybody in the Cambridge finance

19   department, Matt Stephan, Steve Chamberlain, knew about this,

20   the guy is conceding he concealed it from them.

21        And Matt Stephan, you know the Government brought out that

22   he had doubts about what was going on.

23        Okay.  Were you open with Deloitte about this hardware

24   reallocation?

25        **"ANSWER:**  Yep.

1           "QUESTION:  So they have the information available to

2      make their judgment?

3           "ANSWER:  Yes."

4      And Mr. Welham telling you there's nothing wrong with

5      structuring a contract to make title pass in a bonded

6      warehouse.

7           So Mr. Chamberlain is not really involved in this, but the

8      evidence goes to Deloitte.  They make their decision.

9           Third example.  BofA/SHI.  Well, the Government's story

10     was that the hardware was not delivered in the quarter.  And

11     you recall, this was my favorite part of the trial, because

12     they brought in somebody named Stephanie Horan who they were

13     showing a bunch of documents.  She wasn't really on them, had

14     nothing to do with them.  She was sort of a clerical type

15     person, and she read from them.  And they would say, on direct:

16     According to this email was this hardware still in transit.

17          And then on cross I would show her the documents that were

18     sent to Deloitte saying:  Products still in transit.

19          And that there's no dispute that the information you had

20     is what was forwarded to Deloitte.  Here's this email that the

21     Government had put up from Jeff Guido, that the document

22     delivery takes place when the product is placed on the boat in

23     China versus receipt by the customer.  The Government

24     introduced to show that as of April 6th the product was in

25     transit.  Well, it was, and Deloitte was told that the product

```
 1   was in transit.

 2        And if you look at the Deloitte work papers, they cite to

 3   that very email.  That very email which is the essence of their

 4   case is forwarded to Deloitte.

 5        Now, this really has more to do with document delivery

 6   stuff that Matt Stephan dealt with.  They didn't ask Matt

 7   Stephan if he felt that this document delivery here was

 8   improper, but it all went to Deloitte.

 9        And they had one example of a deferral that they brought

10   up involving Morgan Stanley where a decision was made to defer,

11   and they're saying:  Well, it shouldn't have been made to

12   defer.  Well, it was deferred because the lawyer said that the

13   acceptance criteria was not met.  And they brought up this

14   Exhibit 728.  And Matt Stephan says that sometimes you have to

15   be out of -- changes have to be made out of necessity because

16   they can't be substantiated.

17        And here's the email from Jim Crumbacher to the lawyer,

18   and it makes its way to the Deloitte work paper where they say:

19           "Per email with the lawyer.  Title for this equipment

20        has not passed and cannot be recognized."

21        So you can challenge whether it should have been deferred

22   or not, but the lawyer at Autonomy is saying I've reviewed

23   this, I don't believe title has passed.  I'm going to tell that

24   to Deloitte, and they defer it.

25           THE COURT:  Counsel, you have five minutes.  Five
```

```
 1   minutes.
 2           MR. LINCENBERG:  Okay.
 3           THE COURT:  Five minutes.
 4           MR. LINCENBERG:  I'll try to move forward on this.  I
 5   would note that my co-counsel had seven minutes.
 6           THE COURT:  Well, also I have a jury sitting here, and
 7   the agreement was an hour and a half.  So go ahead.
 8           MR. LINCENBERG:  Well, I've been told I only have an
 9   hour and a half.
10       So let's look at the sale to HP that Steve was not
11   involved with.  And the documentation that went to HP lays out
12   all the boards of directors and advisers and senior management,
13   some 20 people.  Steve Chamberlain is not a central player in
14   any of this.
15       And when you get into the due diligence and you look at
16   what the Government alleges, that somehow Mr. Chamberlain was
17   involved in misleading HP, and what the evidence shows is
18   basically that he doesn't have interaction with HP; and that
19   when he was asked to supply sales lists, he was asked by
20   Mr. Hussain -- he doesn't know what Mr. Hussain is going back
21   and forth on with Manish Sarin at HP, who is not called as a
22   witness in this case.  So you don't know what was going on back
23   and forth.
24       But you do know that there's these strict confidentiality
25   requirements.  And Andy Kanter, the COO, general counsel of the
```

 1  entire corporation, and Sushovan Hussain, are dealing with

 2  this, and far be it for Steve Chamberlain to do anything else

 3  than supply documentation to Mr. Hussain that he's asked.

 4      I would suggest that Mr. Gersh is actually not credible;

 5  very defensive, because he's a guy who is involved in doing

 6  this due diligence work on this deal that the client is later

 7  complaining about, and he's mistaken in several ways.  He

 8  destroys his notes of the meetings and the like.

 9      And what did you see in terms of his inconsistencies.  On

10  direct he talks about a conversation.  He says on August 1st

11  Chamberlain was on the conversation.

12      On cross he kind of says:  Well, when I testified a few

13  years ago differently, that's just what I remembered at that

14  time:

15          "QUESTION:  Do you recall a single specific statement

16      from Chamberlain during that call?

17          "ANSWER:  No."

18  Direct:  Chamberlain was on the call with Deloitte.

19  Cross:  We show him the list of people who were on the

20  call.  Steve wasn't on the call.

21      Just a lot of inconsistencies in his testimony.

22      And then you saw these exhibits dealing with the top 40

23  list.  And basically what they showed was Mr. Hussain

24  requesting different lists.  And when Mr. Hussain requests a

25  list of all revenue, Mr. Chamberlain sends the list with all

revenue, including hardware revenue, and the like.

When Mr. Chamberlain is also asked to split out the end users, he splits out the end users. He doesn't know what Mr. Hussain and Manish Sarin from HP are talking about, what information can be supplied at what time. What different sub analyses HP may be doing. He's just responding and doing what he's asked to do.

And you see this go on. And I'm going to race through these because of my time limits. But this email covered by Mr. Heberlig, very important, because basically what they're saying is that material information will be coming later in the due diligence process.

And as far as the Government's case in terms of hardware disclosures, Steve is providing the complete list of hardware disclosures to the lawyer to disclose as part of the antitrust process into dealing with due diligence, showing $107 million of hardware sales.

So it brings me to wrapping this up, and the prosecutor's burden of proof. And I would suggest that one way to look at it is to look at the difference between civil cases and criminal cases.

Civil cases, it's preponderance of evidence. Think of all the money back and forth. Is it more likely than not that one side is correct.

When you get to the next level you have certain cases

which require clear and convincing evidence.  That's a higher
burden of proof.  It's something where, because the stakes are
so high, such as whether or not you can terminate a person's
right to their children, requires a very high burden of proof -
clear and convincing.

Much higher than that is proof beyond a reasonable doubt.
And I like to look at this as looking at what you would do on
this evidence if you were making a decision in one of the most
important of decisions you make in your affairs of everyday
life.

For me it's the question of whether or not I would have to
pull a plug on a parent.  Is the evidence so overwhelming that
there's no reasonable doubt on that?

And when the Government claims that somebody acted in bad
faith, but every witness that the Government called says he
acted in good faith, there is far more reasonable doubt than
anything you could imagine.

Ladies and gentlemen, my client performed his job in good
faith.  The people who worked with him day in and day out four
years dealing with Deloitte, both as auditors and with --
side-by-side with him told you that.  They're the people who
know.  They were the people who the Government called, and
they're the people and that testimony you should rely on.

And if you go back to the very first witness in this case,
Ganesh Vaidyanathan, who said Steve Chamberlain was the one

```
 1    voice of reason, it's not just that Steve Chamberlain is a good
 2    guy.  It's that he did his job honestly and in good faith.  And
 3    that's the evidence which should be most compelling to you.
 4         And so when you receive the verdict form, there is only
 5    one decision which justice compels in this case, it's a verdict
 6    that Mr. Chamberlain is Not Guilty.
 7         Thank you for your time.
 8              THE COURT:  So ladies and gentlemen, we're going to
 9    take our recess now.  We're going to be in recess until 11:15.
10         Remember the admonition given to you:  Don't discuss the
11    case, allow anyone to discuss it with you, form or express any
12    opinion.
13              (Jurors exit courtroom.)
14              (Proceedings heard outside the presence of the jury:)
15              THE COURT:  Okay.  We'll resume at 11:15.
16              (Recess taken at 10:56 a.m.)
17              (Proceedings resumed at 11:13 a.m.)
18              (Proceedings heard outside the presence of the jury:)
19              THE COURT:  Let the record reflect the parties are
20    present, jury is not.
21         Mr. Lincenberg, at the -- in your discussion of beyond a
22    reasonable doubt, you used an example which said that for you,
23    it's like pulling the plug.  That's a totally improper
24    statement to make to a jury.  Pulling the plug on a relative is
25    so emotionally fraught that it isn't just a question of what
```

1    does the evidence show.  It's a question of how you feel about

2    executing or causing the death of a loved one.

3        If you are right, no jury should ever convict anyone of

4    anything who has to suffer through the indignity and the

5    emotional -- the emotional experience of having to say good-bye

6    to a loved one.  That's an improper argument.  Obviously, there

7    was no objection, I note that, but obviously at that time I

8    didn't say anything.

9        What I intend to do is simply read the instruction of

10   reasonable doubt, because it has to be -- reasonable doubt has

11   to be -- a decision has to be made without sympathy, without

12   emotion, without any of those things.

13       So that's what I'm going to do.  I'm not inviting you to

14   comment, by the way.  And I'm having this discussion obviously

15   outside the presence of the jury.  But it was with enormous

16   restraint that I said nothing during your argument at the time.

17   And I wanted to think about it, and I have thought about it,

18   and it seems to me the wrong -- it is an -- it seems to be an

19   improper argument.

20           **MR. LINCENBERG:**  I would like to --

21           **THE COURT:**  Go ahead.

22           **MR. LINCENBERG:**  -- address it, Your Honor.

23       It is emotional.  I understand the Court's reaction.  It

24   is an example or examples like that I've seen a lot of lawyers

25   do.  I actually believed I used the same example in the *Cohen*

```
 1    trial.
 2             THE COURT:  I looked it up.  By the way, I was looking
 3    it up.
 4             MR. LINCENBERG:  Uh-huh.
 5             THE COURT:  -- to see whether this is --
 6             MR. LINCENBERG:  And what did you --
 7         Here we go.
 8             THE COURT:  Well, you used the example of Benjamin
 9    Franklin.
10             MR. LINCENBERG:  That one I don't remember.
11             THE COURT:  I guess he's past.  It's not too soon to
12    comment on Benjamin Franklin's death.
13             MR. LINCENBERG:  Uh-huh.  But, Your Honor, I once
14    heard a lawyer many years ago use that example.  I've used it
15    for years.  I've never had a court --
16             THE COURT:  You didn't use it, that I can see but, I
17    mean, it doesn't make any difference?  I mean, unless I --
18    unless I invited it in.
19         I don't want to -- I don't want to discuss this at great
20    length.  It's nothing -- I hope you understand it's not
21    personal.  I mean, you know how much respect I hold for you and
22    the lawyers all around.  I mean that's absolutely true.  But
23    it's my job to make sure that the jury follows the law, to the
24    extent I can do it.  To the extent I can do it.
25         And so I'm just going to read to them what the instruction
```

```
 1    is, and I may add a few comments about how to go about it, but
 2    I'll keep it as vanilla as I can.
 3              MR. LINCENBERG:  The Court's going to read this now or
 4    after?
 5              THE COURT:  Right now.
 6              MR. LINCENBERG:  Okay.  I --
 7              THE COURT:  I don't feel it's the Government's duty to
 8    go out there and criticize that aspect of your argument.  It's
 9    just too -- it seems -- they can say whatever they want to say
10    about reasonable doubt.
11              MR. LINCENBERG:  Right.
12              THE COURT:  But it has to come from the court.  The
13    law has to come from the court.
14              MR. LINCENBERG:  I very respectfully, I do object.  I
15    don't think it's appropriate --
16              THE COURT:  Okay.
17              MR. LINCENBERG:  -- to be read right now.
18              THE COURT:  Okay.
19              MR. LINCENBERG:  But thank you, Your Honor.
20              THE COURT:  Okay.  Thank you.
21         Okay.  Bring in the jury.
22              MR. REEVES:  Is it the Court's intention to read the
23    instruction?
24              THE COURT:  To do it now.
25              MR. REEVES:  Yeah.  Thank you.
```

```
 1                (Jury enters courtroom.)

 2                (Proceedings were heard in the presence of the jury:)

 3          THE COURT:  Please be seated.

 4      Let the record show that the jurors are present.

 5      Ladies and gentlemen, there have been some arguments as to

 6  reasonable doubt and what is meant by reasonable doubt.  It's

 7  obviously the standard that must be applied by you in

 8  connection with the decision you are about to make.  It is a

 9  standard to use without emotion, without sympathy, without

10  prejudice and without passion, and, thus, it is not the kind of

11  decision that you have to make in deciding whether a relative

12  or a loved one must die.  It's not that decision.

13      I will tell you what it is, and you are instructed to

14  follow this.

15      A reasonable doubt is a doubt based upon reason and common

16  sense and is not based purely on speculation.  It may arise

17  from a careful and impartial consideration of all the evidence

18  or from lack of evidence.

19      That's the instruction on reasonable doubt.

20      And now we'll turn to the Government's rebuttal.

21                  REBUTTAL CLOSING ARGUMENT

22          MR. REEVES:  Thank you, Your Honor.

23      May it please the Court.

24      Good morning, Ladies and Gentlemen.  You're almost there.

25      When you boil down this massive trial record there are
```

really only three basic overarching questions.  First, was there a fraud at Autonomy?  To a degree that is undisputed. Even Dr. Lynch acknowledged that the backdated Prisa deal and the roundtrip payments to Capax for work it never did were wrong.  That is an admission that there was a fraud at Autonomy.  That was a point scored in cross-examination.

Second question, if there was a fraud at Autonomy, what was the scale of the fraud?  Well, this point has been contested.  If you look closely at the trial record, I submit to you that there's only one reliable answer.  It is the independent opinion of Mr. Brice, who looked at all of the relevant information, undertook a comprehensive forensic accounting review, and concluded that Autonomy's revenues had been falsely inflated by approximately $311.1 million.  That's massive.

The other two accounting assessments of Autonomy's financial statements are both deeply flawed but for two very different reasons.  One is Mr. Taylor, who reviewed no records and made no case-specific findings about Autonomy at all.  I submit his opinion is basically worthless.  And the other is Deloitte.  And as the evidence shows, Autonomy lied to Deloitte again and again about backdating, about the oral agreements with the resellers, about the roundtrips with FileTek and VMS, about the channel stuffing with MicroLink and other VARs, and, importantly, about how Brent Hogenson's whistleblower complaint

```
 1   implicated Sushovan Hussain - Mike Lynch's key coconspirator.
 2        Deloitte may have known about the strategic low margin
 3   hardware sales, but Autonomy sure lied to Deloitte about nearly
 4   everything else.
 5        Which brings us to the final and most important question
 6   of all:  Were the defendants involved in the fraud?  I plan to
 7   devote the rest of my time to highlighting the evidence that
 8   rebuts the defense claims that they were not involved, because
 9   the evidence in this case shows that they were involved, big
10   time.
11        But to frame that analysis, I'm going to ask you -- I'm
12   going to ask you all a question:  What do you think the chances
13   are that Mike Lynch, the dominant, detail-oriented uber boss,
14   and Steve Chamberlain, Hussain's dutiful finance controller
15   with all the details, according to Jonathan Bloomer, what do
16   you think the chances are they weren't involved in this massive
17   fraud?
18        All of you already know the answer to that based on this
19   trial record.  The chances are zero.  There are too many emails
20   connecting them both to the core issues.  There are too many
21   people expressing concerns about the very things they were
22   doing.  There is no way a fraud on this scale was perpetrated
23   without the drive of Mike Lynch for quarterly success or
24   without the complicity of Steve Chamberlain, through whom all
25   or many of the fraudulent documents ran to Deloitte.  No way.
```

```
 1         This was a conspiracy.  Everyone had a job.  Hussain and
 2    Egan cooked up the deals.  Steve Chamberlain blew them past the
 3    auditors, and Mike Lynch flew the plane and handled Autonomy's
 4    long-running deceptions to the market about Autonomy's reliance
 5    on low margin hardware revenue.
 6         Dr. Lynch's principal defense seems to be Dr. Lynch
 7    himself.  Witness testimony proves Mike Lynch was micro-focused
 8    on the quarter close.  He ran Autonomy like a start-up, where
 9    every decision is made by the boss.  This evidence stands in
10    contrast to Dr. Lynch's claim that he took the afternoon off
11    the day the quarters closed.
12         Stouffer Egan testified as follows:
13         "QUESTION:  And did Dr. Lynch appear focused on
14    Autonomy's revenue targets from where you stood?"
15    Answer by Mr. Egan:
16         "ANSWER:  Yes.
17         "QUESTION:  What was your experience?
18         "ANSWER:  That he cared very much about revenue.  It
19    was a publicly traded company, so there were targets, and
20    that was kind of our ultimate goal.
21         "QUESTION:  Did Dr. Lynch appear focused on
22    Autonomy's significant sales?
23         "ANSWER:  Yes.
24         "QUESTION:  As a general matter, did Dr. Lynch pay
25    very close attention to Autonomy's revenues?"
```

```
 1        Answer by Mr. Egan:
 2            "ANSWER:  Yes.
 3            "QUESTION:  Was that particularly true at the end of
 4        the quarter?
 5            "ANSWER:  Yes."
 6        That's corroborated by the testimony of Marc Geall.  Marc
 7    Geall was asked the following question:
 8            "QUESTION:  What do you mean by quite controlling?
 9            "ANSWER:  I would -- you know, Mike has, you know,
10        has strong or had strong decision making over many, many
11        things, right?  I think even in the research note I wrote
12        in 2010 I mentioned the fact that, you know, he was -- he
13        was very entrepreneurial.  He, you know, ran it as if it
14        was still a start-up making, you know, all decisions for
15        the business, you know, even down to signing off
16        relatively small invoices that happened within the
17        business, right?
18            "I mean, I'm not sure I would call him a control
19        freak but, I mean, there was certainly an element of
20        control there that he ensured was in place."
21        In his October 2010 note Mr. Geall goes on and makes the
22    following point.  He says that -- he talks directly about Dr.
23    Lynch's dictatorial approach.  And this is a person who had
24    worked with Dr. Lynch for the better part of two years.
25        The cross-examination also introduced numerous emails
```

1    showing how badly IDOL's sales were doing in the wake of the

2    financial crisis.

3        Here's another one of those emails.  Mike Lynch is urging

4    Stouffer Egan about another landslide failure in the U.S.  It's

5    indicative of the kind of serious sales problems Autonomy faced

6    in 2009 and increasingly in 2010.

7        In many ways, the defense seems to rely -- at least Dr.

8    Lynch's defense seems to rely solely on Mike Lynch himself.  So

9    I'd like to go straight to a critical question that you as

10   jurors will have to assess:  Can you rely on the defendant's

11   testimony?  Was Dr. Lynch credible?  He certainly was polished.

12   He certainly was comprehensive.  But was he credible on the

13   core point of whether Mike Lynch was involved in the fraud or

14   whether he really was above it all, taking the afternoon off on

15   the last day of the quarter?  On that key point I submit to you

16   that he lied.

17       Witness after witness told you about Mike Lynch's total

18   control of Autonomy, how exacting and detailed he was,

19   detail-oriented he was, and how intimidating he could be to

20   work for.  Why would it be any different at the quarter close?

21       This brings me to the importance of the Q1 2010 emails

22   that were introduced through Dr. Lynch in the

23   cross-examination.  They're a group of emails, this is one of

24   them, that you're looking at.  As a group, these emails show

25   Mike Lynch's microscopic involvement in closing Autonomy's

quarter.  I submit to you they give you a clear sense of how
important the quarter close really was for Dr. Lynch.  Yet,
that is not what Mike Lynch said on the stand.  He claimed his
interest in this quarter was a one-off, because he was trapped
in San Francisco with his kids.

He seems to suggest that he paid attention to the quarter
close in March, April 2010, only because he was stuck in a
hotel room and had nothing better to do than email about the
quarter.  Do any of you think that's really true?  Or was the
one-off using emails to Hussain to close the quarter because
Dr. Lynch was not in London with Hussain, the way he was for
all the other quarters, to talk to him about closing the
quarter in person?

Lynch would have you believe that the quarter was the
aberration.  I submit to you that it was the emailing that was
different.  The weight of the evidence suggests Mike Lynch was
laser-focused on every quarter, but rather than be in London
with Hussain for the first quarter of 2009, he was emailing
with Hussain from San Francisco.

If you agree, then Mike Lynch's claim to be above it all,
taking the afternoons off for the quarter close lacks all
credibility.

The Q1 2010 emails introduced in the cross-examination
bury Mike Lynch.  Read closely -- please read closely the entry
in the lower left-hand corner.  "Minus 5, replace low margin

closed with high."  That's important.  That means manipulate

Autonomy's gross margin by adding a backdated software

contract, and strip out the low margin hardware they were using

to make their numbers.

I submit to you Mike Lynch shaped his story from the stand

about the Q1 2010 emails around the evidence.  He wants you to

think he had no role in closing the quarter.  The Q1 2010

emails as a group suggest otherwise.  So he had to try to

explain them.  And the idea that he la-di-da'd his way through

the afternoons of the quarter close is a fiction.  Of course

the quarter close is important.  Of course Mike Lynch was

micro-focused on it like everyone else at Autonomy.  Emails

like this one for the Q1 2010 quarter prove it.

Indeed, that's why in a two and a half hour summation by

the Lynch team they didn't even address them.  The emails link

Dr. Lynch to the backdated deals and show him directing the

manipulation of Autonomy's gross margin number after the fact.

These emails show Mike Lynch directing the fraud.

And this is one of the most important ones in the case.

This is approximately a year later, in or around the first

quarter of 2011.  At that time they do, they, Hussain, Lynch,

with an important note to talk to Steve at the bottom, they do

the same thing.  They do the same thing in order to manipulate

gross margin to 88 percent by fraud.  This time they are using

the backdated Prisa contract.  This document came in on the

cross-examination.  It was untouched by the defense, because a close reading of it proves Dr. Lynch and Steve Chamberlain's involvement in the fraud.

One of the ways you know that is because of this email. Here, Steve Chamberlain chooses option 1 to cook the books and get a higher gross margin figure in the same month Dr. Lynch is meeting with HP.  It matters.

The defendants don't need the backdated contracts to hit consensus in this quarter.  They already did that.  They need to backdate the Prisa deal and the Capax EDD deal to raise their gross margin by fraud.  And ladies and gentlemen, that's cooking the books.

Mike Lynch made up a story to explain the Q1 2010 emails and falsely suggested he was far too above everything to be involved in closing the quarter.  That he would make up stories in advance is corroborated by other evidence like the lies he urged Harald Collet to tell Lone Pine, and the defendant's advice to duck and stall regarding any follow-up questions by Lone Pine.

Same for the Q&A.  He was planning for the OEM questions. "Waffle it."

Those documents speak for themselves.  Dr. Lynch is adept at disassembling, tailoring his story, and obfuscating when it's necessary to do so.

I submit to you that Mike Lynch ducked and stalled on the

```
 1   stand.  He waffled it on the stand.  And one of his least
 2   credible, most deceptive claims that he was -- was that he was
 3   not really involved in closing Autonomy's quarters.  Of course
 4   he was.
 5        Let's talk about the -- what I'll call the Autonomy
 6   business records defense.  Many of the defenses by both
 7   defendants are predicated on the reliability of Autonomy's
 8   business records.  The defendants insist the dates, the payment
 9   terms, the non-cancelability terms of the contracts support
10   revenue recognition for the deals.  It is true that the
11   contracts, as written, support revenue recognition, but it is
12   also true that substantial amounts of the trial record, like
13   the testimony of witnesses like John Baiocco, Steve Truitt,
14   Dave Truitt, and Bill Loomis call into question whether the
15   contracts truly reflect the agreements between the resellers
16   and Autonomy.  Indeed, most of the time they don't.
17        So the question becomes can the defendants really rely on
18   Autonomy's business records when much of the evidence in the
19   trial leaves no doubt that there were rampant oral side
20   agreements, deal terms that were not written down precisely in
21   order to ensure the wrong revenue recognition treatment.
22        There's been a lot of discussion about the backdating.
23   We'll talk some more about it.  But the bottom line is, the
24   date is wrong, and it's intended to falsely mislead someone
25   about when the contract was signed.  I'll come back to that
```

1  when we talk about BofA.

2      That's why the typewritten date in the bottom of the

3  backdated document is so important.  It's intended to deceive.

4      Payment terms.  You heard testimony from Steve -- Dave

5  Truitt about the flexibility on payment terms.

6      When Dave Truitt said payment terms were flexible, how

7  does that square with you need to pay X on Y date?  It doesn't.

8  It suggests what the evidence proves:  Dave Truitt paid

9  Autonomy back only after Autonomy paid him.  Same for John

10 Baiocco.  Same for Steve Truitt.  That's the way it worked.

11     It is no defense to point to Autonomy's business records

12 and say they prove there were no oral side agreements.  They

13 don't, because you know the key business records at Autonomy do

14 not mean what they say they mean.  They are not reliable.

15 There were oral side agreements, and as a result the contracts

16 are false and misleading and intended to mislead, as they did

17 the auditors.

18     The auditors did not have the benefit of the witness

19 testimony, but you do.  You've learned that contracts that are

20 supposed to not be cancelable are cancelable.  Here, at the end

21 of the period during the period of time when all the credit

22 memos were being issued, Dave Truitt is explicitly looking to

23 cancel his deals.  If you read the contract, that's not

24 allowed.

25     John Baiocco testified about canceling deals.  Question --

```
 1   testimony by Mr. Baiocco:

 2          "ANSWER:  Kraft paid them so they gave me a revised

 3      payment agreement, meaning we didn't have to -- we didn't

 4      have to pay because we had gotten the money directly.

 5          "QUESTION:  All right.  So Autonomy got the money

 6      directly?  The reseller deal is being canceled and you're

 7      being paid your fee?"

 8      Answer by Mr. Baiocco:

 9          "ANSWER:  Correct."

10      You know also that fair value purchases aren't always what

11   they seem.  There are pretextual emails in this case that

12   Mr. Egan has testified about -- there we go -- discussing this

13   email which Mr. Egan described as pretextual.  He said the

14   following:

15          "QUESTION:  Why is this a pretextual email?"

16      Answer by Mr. Egan:

17          "ANSWER:  Because we don't have to buy more FileTek,

18      so I frame it as a have to, and I also frame the last

19      sentence as pitching on the last day of the quarter to get

20      the best pricing.

21          "In my mind we don't have to buy it, but it's an

22      opportunity it do it" -- and the last sentence "I don't

23      have to do anything like that.  I just have to bring up

24      and kind of air a good deal for both parties.  That's just

25      generally how quid pro quo things worked."
```

1        Autonomy's contracts and business records falsely

2    suggested to outsiders like Deloitte that they contained all

3    the relevant terms when the trial testimony shows that they

4    didn't.  The defendants used the seeming legitimacy of the

5    company's business records to conceal their scheme to defraud.

6        Let's talk about the so-called accounting judgments

7    defense.

8        The defendants also insist this case is really about

9    accounting judgment.  It isn't.  To evaluate the scale of the

10   fraud at Autonomy, it certainly helps to assess the accounting.

11   To that end, I submit to you there is really only one choice:

12   The Government's expert Steve Brice from Mazars.  Only Mr.

13   Brice rendered an independent accounting judgment based on

14   comprehensive forensic reviews of the evidence.

15       Mr. Taylor, for all his erudition, did not do that.  He

16   looked at no records and reached no conclusions about the

17   appropriate accounting for any of the actual deals.  None.  He

18   did say that to get the accounting judgment right, you needed

19   to elevate substance over form, the actual agreements, not just

20   the written documentation.  And that was helpful.  And it was

21   consistent with Mr. Brice.  But it leads straight back to the

22   need to review documents and other evidence to assess the

23   substance, which Mr. Taylor did not do.

24       That leaves Deloitte.  The evidence involving Deloitte is

25   quite important, but not for the reasons that the defendants

1  suggest it is.  Deloitte's accounting judgment was based on the

2  lies about the deals that Mr. Hussain and Mr. Chamberlain gave

3  them.

4      As Lee Welham said, you really can't do an audit if there

5  is a management integrity issue at the client, and there

6  certainly was a management integrity issue at Autonomy.  So you

7  can't rely on Deloitte's accounting judgment either.

8      The evidence involving Deloitte, more specifically the

9  lies fed to Deloitte, is highly relevant for another reason -

10  criminal intent.

11      The defendants lied to Deloitte about the actual date of

12  their backdated agreements.  The scheme:  Lie to Deloitte about

13  there being no side letters or oral side agreements when there

14  were.

15      There were lies to Deloitte about whether deals were

16  linked.  Deals were linked like this one involving FileTek.

17      There were lies to Deloitte about whether the file

18  house -- FileTek StorHouse software was integrated into Digital

19  Safe.  It wasn't, according to Roger Wang.  You'll remember

20  Mr. Wang, he was asked the following questions:

21          "QUESTION:  To your knowledge at this time did

22      StorHouse even have the capability to read files from or

23      write files to Digital Safe?"

24      Answer by Mr. Wang:

25          "ANSWER:  Not at this point, no.

1          "QUESTION:  What do you mean when you say you set up

2      one instance?

3          "ANSWER:  Like we installed the software on a machine

4      within one customer's safe environment, and I think we put

5      one file from the customer on the same machine.

6          "QUESTION:  Which customer?

7          "ANSWER:  Kraft.

8          "QUESTION:  And Digital Safe has a proprietary file,

9      right?

10         "ANSWER:  Correct.

11         "QUESTION:  Could StorHouse read the RT files."

12     Answer by Mr. Wang:

13         "ANSWER:  I don't believe.  So it was a proprietary

14     format to Digital Safe, so I don't think any external

15     software should be able to read that.

16         "QUESTION:  So, and did Kraft even know that you had

17     done this?

18         "ANSWER:  I don't believe they were aware."

19     Moving a few emails was a charade, and it was a charade

20     undertaken in order to deceive Deloitte into thinking that

21     there was integration when there wasn't.

22         There were lies to Deloitte about delivery.  You've heard

23     plenty of testimony from my colleague, Mr. Leach, about the

24     manipulation of the invoices around delivery.  I'll show it to

25     you one last time.

1        This invoice was falsified.  It was falsified to mislead

2   Deloitte about the delivery by stripping out that critical

3   language.  And Deloitte was lied to about that specific issue

4   after they asked for that specific representation.

5        In the end, Steve Brice alone reveals the scale of the

6   fraud at Autonomy, but the evidence relating to the lies to

7   Deloitte leaves no doubt that Steve Chamberlain acted with

8   criminal intent.

9        Let's talk about the so-called auditors who said it was

10  okay defense.

11       The auditors are a big part of Mike Lynch's defense as

12  well.  There's been a heavy emphasis by the defendants that the

13  auditors said it was all okay.  I encourage you to evaluate

14  that claim very, very carefully.

15       To do that, let's put aside the clear evidence of rampant

16  lies to Deloitte, which I just touched on.  Let's also put

17  aside the evidence of Mike Lynch's own involvement in the

18  manipulation of gross margin after the fact using deferred low

19  margin hardware and backdated software contracts.

20       Let's just focus on the defendant's claim that Deloitte

21  blessed all of the annual report, not just the financial

22  statements themselves, like the income statement and the

23  balance sheet.

24       This is the part of the case that plowed into the

25  difference between the front half and the back half of the

1    annual report.

2        Lee Welham told you Deloitte audited the back half or the

3    actual financial statements themselves, and that they reviewed

4    the front half or narrative part of the annual report for --

5    key words -- consistency, numerical consistency with the back

6    half or the financial statements.  This is a critical

7    distinction.  Please focus on it carefully.  Why?  Because Mike

8    Lynch was lying about Autonomy being a pure software company in

9    the narrative or front half of the annual report, and he is

10   desperate to have you think Deloitte said it was okay.  They

11   didn't.

12       Given Autonomy's massive sale of low margin hardware, it

13   was extremely misleading to say Autonomy was a pure software

14   company.  It wasn't.  And nothing about Deloitte's process

15   blessed this lie.

16       Here are four excerpts from Lee Welham's

17   cross-examination.  Four times counsel tried to get Mr. Welham

18   to say Deloitte's review of the front half of the annual

19   report -- tried to get Mr. Welham to say that Deloitte's review

20   of the front half of the annual report in order to get him to

21   say it wasn't misleading.  And four times Lee Welham said

22   Deloitte reviewed the front half for consistency with the

23   numbers in the back half.  Nothing more.

24       That is corroborated by one of the more unique pieces of

25   evidence in the case.  Here is Deloitte's version of the Q3

2009 earnings announcement.  You see the handwritten

checkmarks.  Where do you see them?  You see them next to the

numbers and the deal names in the back half of the financial

statements.

Importantly, you do not see checkmarks next to Mike

Lynch's quotes.  That corroborates Mr. Welham and torpedoes the

defendant's claim that somehow Deloitte blessed Lynch's lies

about low margin hardware.  They didn't.

Brent Hogenson recounted an interesting statement by

Sushovan Hussain in early 2009, soon after Autonomy's

acquisition of Interwoven:

"**QUESTION:**  During the time period after the

acquisition of Interwoven, in or around March 2009, for

the next year plus into early 2010, in or around April

2010 when you began to do the consolidation work you

described, in the course of your conversation with

Mr. Hussain and Mr. Chamberlain did you have an

opportunity to learn how Mr. Hussain interacted with

Autonomy's auditors at Deloitte?"

Answer by Mr. Hogenson:

"**ANSWER:**  I remember an interesting conversation

slash comment of when we were going through the meeting

right after the acquisition in the U.K.  I had had a

conversation with Sushovan Hussain, and I remember there

was a comment that he made, and I don't remember the

```
 1          context around the comment, but I remember his comment was
 2          don't worry about Deloitte, they work for me."
 3               "QUESTION:  He said me?
 4               "ANSWER:  He said me, and me.  He said me, then that
 5          would be Mr. Hussain."
 6          So that was confusing when it came out.  I asked the
 7     question:
 8               "QUESTION:  Deloitte was Autonomy's independent
 9          outside auditors?  That's correct?
10               "ANSWER:  Yes.
11               "QUESTION:  And in this conversation, the substance
12          of which you were recounting, Mr. Hussain is saying that
13          Deloitte works for Sushovan Hussain?
14               "ANSWER:  Well, he used the word me.
15               "QUESTION:  And how did that strike you?"
16     Answer by Mr. Hogenson:
17               "ANSWER:  Incredibly unusual.  In my career I would
18          never have said that the outside auditors work for me.  In
19          fact, I would have said -- in fact, if I would have said
20          that, I may have been fired for it.
21               "QUESTION:  Do you -- would it be fair to say in a
22          sense that Mr. Hussain was bragging?"
23     Answer by Mr. Hogenson:
24               "ANSWER:  I don't really know whether he was
25          bragging.  I just -- I think he was stating something that
```

1        he thought was obvious."

2        The scale and duration of the lies to Deloitte by Autonomy

3    certainly suggest that Autonomy took advantage of Deloitte.

4        Frankly, Autonomy probably pushed Deloitte around

5    precisely as Mr. Hussain suggested to Mr. Hogenson.

6        Even so, Deloitte performed only audit and review

7    procedures.  As Mr. Welham explained, they were onsite for only

8    a few weeks.  Mr. Welham had several other clients, even if

9    Autonomy was his biggest.

10        Mr. Hussain and Mr. Chamberlain took care to elaborately

11    conceal their lies to avoid a management integrity issue that

12    would trigger greater scrutiny by Deloitte.  And Dr. Lynch

13    contributed to this elaborate charade by quickly stifling Brent

14    Hogenson on the issue of Hussain's involvement in the

15    accounting fraud - something I'll get to in a minute.

16        When you strip it all down, neither Dr. Lynch nor

17    Mr. Chamberlain can honestly say that Deloitte approved and

18    sanctioned the accounting fraud precisely because no auditor

19    can ever render a clean opinion when they have been lied to.

20    That's why the Brice report is the best and only real evidence

21    of the scale of the fraud at Autonomy, and that's why the

22    evidence involving Deloitte is some of the best to show the

23    defendants' criminal intent.

24        Let's talk about the so-called operating cash defense.

25    That's another major defense.  The defendants seemed to claim

1    that all that really mattered was operating cash.

2        The evidence suggests Mike Lynch often emphasized

3    something else.  He emphasizes revenue.  "Revenue, revenue,

4    revenue."  Do you think Mike Lynch ever flogged his troops

5    saying "Operating cash, operating cash, operating cash?"  I

6    don't think so.

7        And there's a reason for that.  You do not estimate future

8    growth or the future stock value based on the cash that you

9    have in the bank today.  You base it on revenue and the growth

10   of revenue year over year into the future.  Andy Johnson said

11   as much during his testimony.  This is the executive from HP:

12           "QUESTION:  Am I right that among the other things

13       this identified the company had -- am I right that among

14       other things this identified that the company had more

15       than 1 billion in cash and no net debt?

16           "ANSWER:  The second bullet point yes, that's

17       correct.

18           "QUESTION:  And was that attractive to Hewlett

19       Packard?"

20       Answer by Mr. Johnson:

21           "ANSWER:  Uh, not -- I mean, other than there wasn't

22       a liability we'd be inheriting if we bought it, but the

23       cash is -- no.  HP has billions and billions of dollars.

24       This wouldn't be, I don't think, high on the screening of

25       what we look for in a company."

1          The hosting deals had an effect -- had the effect of

2    pulling future cash into the present, inflating cash from

3    operations at the expense of the long term.  So what if the

4    long term cash was not guaranteed under the existing agreements

5    that Autonomy had, it was money Autonomy could reasonably

6    expect to receive in the future.

7          If, as Steve Brice did, you scrutinize where the cash was

8    coming from, like from hosting, like from acquisitions, like

9    from fraud, Autonomy's cash from operations was a lot less

10   exciting, almost flatlining over the last three years.

11         The evidence suggests little real interest in the

12   company -- in a company because it has a lot of cash in the

13   bank.  The evidence in this case, I submit to you, strongly

14   suggests that the market was keenly interested in revenue

15   growth - the ability of a company to earn more cash in the

16   future.

17         Even though they are highly conceptual, the two arrows are

18   highly important, okay?  Which company do you want to own stock

19   in, one that is growing organically, selling a high margin

20   product like software, or one that is growing by reselling low

21   margin hardware at a loss and acquiring revenue from other

22   companies selling other products?  You don't have to work on

23   Wall Street to know the answer to that question.

24         Although there's a myriad of ways to make it all seem more

25   complicated, these two arrows are really at the heart of the

fraud at Autonomy:  Mike Lynch's lies about low margin hardware
being Arcpliance, by which he means high margin software, are
motivated in -- by trying to make Autonomy look like it was
growing organically when it wasn't.

Steve Chamberlain's lies about Autonomy's revenue, the
core accounting fraud around their VARs, backdated deals, the
failed delivery were all designed to carry out a scheme to make
Autonomy look like it was growing faster than it was.

These gimmicks and Autonomy's other revenue gimmicks, like
accelerated hosting or lying about OEMs, painted an epic false
picture of organic growth when, in fact, Autonomy labored to
sell its core product, IDOL, in the wake of the 2008 financial
crisis.

Please think carefully about the story of the two arrows.
I submit to you that they're the absolute heart of the fraud
that happened at Autonomy.

In evaluating Autonomy, HP was certainly focused on
Autonomy's future or the drag through revenue as Frank
Quattrone told Dr. Lynch.  David Toms, the analyst who
testified answered this question directly.

Question to Mr. Toms:

"QUESTION:  The question really is around the two
arrows, and if Autonomy is growing organically, selling
high margin software in the amounts it's reporting, and
there's no disclosure around the revenue, does that drive

1    valuations in your world as an analyst up, up, up, so to

2    speak?"

3    Answer by Mr. Toms:

4        "ANSWER:  Yes.  Organic growth is -- high levels of

5    organic growth are positive for valuation.

6        "QUESTION:  And if that were not the case, and if it

7    was not organic growth, and if it was revenue associated

8    with the sale of hardware for which there's a low margin,

9    does that drive the valuation maybe horizontally or even

10   down?"

11   Answer by Mr. Toms:

12       "ANSWER:  Yes.

13       "QUESTION:  Why would a couple million of dollars in

14   changes around Interwoven's growth in the stub period or

15   underperformance in the stub period make such a big

16   difference?

17       "ANSWER:  Because in the context of about $100

18   million of revenue, 2 million might seem like a small

19   number, but in the context of, let's say, a hundred

20   million growing to 110, so you've grown by 10, two is a

21   large proportion of the growth.  So" -- according to

22   Mr. Toms -- "small changes in numbers can have a large

23   impact on growth."

24   I submit to you that's important testimony about how small

25   fraudulent deals can have a big fraudulent impact.

1          Let's go to the "It's just business" defense.  We heard a
2     lot about that in the course of the trial.
3          Another defense refrain throughout the trial was "It's
4     just business."  Autonomy's decision to buy stuff from a
5     partner who was buying Autonomy stuff at a lower price is just
6     business.
7          Autonomy's decision to voluntarily keep selling to help
8     the reseller close the deal, even though John Baiocco and Steve
9     Truitt both told you they would have loved to work with the end
10    users but were effectively kept out of it, that, according to
11    the defense, is just business.  Okay.  That might be true one
12    or two times.  Every business is free to make a commercially
13    boneheaded decision a few times.  But at Autonomy, this type of
14    bad business, commercially loss generating bad business
15    decisions seems to have been a core line of work.  I'm not
16    kidding.  The balance sheet of fraud that you heard about
17    yesterday I think goes straight to that point.  Look at how
18    little money Autonomy made on the VAR transactions that have
19    been the focus of this case.  There is a clear pattern.
20         The Capax EDD payment chart reflects 10 payments from
21    Capax to Autonomy preceded by Autonomy paying Capax.
22         The Microtech payment chart demonstrates seven deals in
23    which Microtech is making payments preceded by Autonomy.
24         The DiscoverTech payment chart, which starts meaningfully
25    in 2010, has two major deals in which DiscoverTech's payments

are preceded by Autonomy's payments.  This was great business for the resellers.  It's not great business for Autonomy.

And it raises a key question.  Why would Autonomy do so much bad business?  Answer to that is easy, based on this trial record.  Autonomy was doing so much bad business to falsely inflate revenue and conceal declining sales.  IDOL did not sell well.  It was a Lamborghini when the market wanted a Volkswagen.  So to compensate, Mike Lynch had to engage in some new math:  Fraudulent VAR deals plus low margin hardware plus accelerated hosting deals equals inflated claims of growth.

But each quarter it got bigger and bigger.  If you want to look like you're growing, you need to say you are growing.  So each quarter Stouffer Egan's nightmare became Mike Lynch's nightmare.

In 2009, Autonomy began to buy its own revenue, and by 2011 it couldn't stop.

I'm showing you this exhibit, 15395.  This is indicative of how, by 2010, Autonomy was stockpiling low margin hardware using it as a piggybank to hit its numbers when its software sales fell short.

Stouffer Egan told you each quarter became harder and harder.  The hole became deeper and deeper.  Stouffer Egan's nightmare became Sushovan Hussain's nightmare, and eventually it became Mike Lynch's nightmare.  Only radical action would do.  This is what Mr. Hussain is telling Dr. Lynch in December

```
1   2010, just as they begin to negotiate with HP.
2         That radical action, I submit to you, is reaching out to
3   and beginning the process of selling to HP.
4         Let's talk a little bit about Mr. Chamberlain and what
5   I'll -- I mean this respectfully -- refer to as the finance
6   department defense - this claim that he's just like everyone
7   else in the finance department.
8         As the Court has instructed you, your duty is to decide
9   the facts.  That will be your job, to decide what happened.  To
10  do that, you have to put aside your likes and dislikes; you
11  have to put aside any sympathy and decide the facts of what
12  happened in this case.
13        By all accounts, Steve Chamberlain was a nice guy.  As the
14  Court has instructed you, that is irrelevant to whether he
15  committed the crimes or not.  Every one of you knows nice
16  people who have made big bad mistakes or made bad decisions.
17  That is exactly what Steve Chamberlain did in this case.  He
18  faced the same problems and concerns about what Mike Lynch and
19  Sushovan Hussain were doing, that Matt Stephan, Harald Collet,
20  Marc Geall and Brent Hogenson did, but Steve Chamberlain made
21  very different choice.
22        Reena Prasad and Percy Tejeda disclosed aspects of the
23  fraud to Mr. Chamberlain in and around June 2010 and within
24  weeks they were fired.
25        According to Joel Scott, Reena Prasad was fired for
```

 1    "Sticking her head above the parapet."  That's the way Mike
 2    Lynch's senior executives talked.
 3        There's been some discussion today about Matt Stephan.
 4    I'd like to recount some of Mr. Stephan's testimony about his
 5    dealings with Mr. Chamberlain.
 6        Question to Mr. Stephan:
 7            "QUESTION:  Did you feel some form of embarrassment
 8        in putting these deals -- putting forward these deals to
 9        the auditors?
10            "ANSWER:  Yes, I did.
11            "QUESTION:  What did you mean by that?
12            "ANSWER:  I just felt a bit dirty dealing with this
13        kind of stuff, and I just knew in my heart that it just
14        didn't make sense, didn't line up with all the rationale
15        we had given previously.  Just felt like we were managing
16        a number rather than, yeah, running a business like we
17        used to.
18            "QUESTION:  When you started to raise concerns about
19        the reseller deals with Mr. Chamberlain, did you perceive
20        some change in your relationship with Mr. Hussain?"
21        Answer by Mr. Stephan:
22            "ANSWER:  Not upfront.  Later in 2010 when, you know,
23        I guess I tried to retreat as much as I could from this, I
24        think I fell out of favor with Mr. Hussain.
25            "QUESTION:  What do you mean?

```
 1        ANSWER:  I guess I wasn't super helpful with trying
 2       to help him hit his targets or find more revenue or, you
 3       know, bat away the auditors' questions and whatever it was
 4       that he needed.  I guess I just, you know, tried to drag
 5       my feet and stay out of it as much as I could.
 6        QUESTION:  When you raised concerns about the
 7       resellers with Mr. Chamberlain, did he ever attribute what
 8       Autonomy was doing to Mr. Hussain?
 9        ANSWER:  Yes.  It was we were only doing it because
10       we had to.  It wasn't a thing that either of us believed
11       in."
12   On or around April 22nd, 2010, the day after the Q1 2010
13   earnings announcements, Steve Chamberlain wrote this near
14   resignation letter.  I submit to you he was all but admitting
15   about how uncomfortable he was with being asked to manipulate
16   gross margins in the manner that he did around the Vatican and
17   the Auxilium deals that you've heard evidence about, and the
18   deferred revenue for the hardware in that quarter.
19        A few weeks later Reena Prasad frankly conveys the
20   substance of this email to Mr. Chamberlain when he visited in
21   San Jose.  At that time Steve Chamberlain learned, if he didn't
22   know before, that Capax will not pay until Autonomy pays.
23        That's not what the contract says, but the contract be
24   damned.  That is a clear indication, as you know from
25   Mr. Hogenson, about the possibility of an accounting
```

 1    irregularity, the possibility of an oral side agreement.

 2        Ms. Prasad testified about -- about that very point.  I'm

 3    coming back to it.

 4        Question to Ms. Prasad:

 5            "QUESTION:  Was Mr. Chamberlain's visiting the

 6        San Jose office that week?

 7            "ANSWER:  Yes, he was.

 8            "QUESTION:  Did Mr. Chamberlain visit the Autonomy

 9        office in California on more than one occasion?

10            "ANSWER:  Yes, on multiple occasions.

11            "QUESTION:  So were you putting together this

12        information in preparation for that meeting?

13            "ANSWER:  I was, that's correct.

14            "QUESTION:  So was your understanding that

15        Mr. Chamberlain was already aware of this issue when you

16        were writing this email?

17            "ANSWER:  Yes, definitely.

18            "QUESTION:  And the reference to where we do not have

19        end users, was this an issue for you because it was

20        affecting your ability to collect payment?

21            "ANSWER:  Yes, absolutely.

22            "QUESTION:  And why is that?"

23        Answer by Ms. Prasad:

24            "ANSWER:  Similar to, as mentioned yesterday, if the

25        end user is not in place or there's not a firm deal in

1          place, then the reseller won't be receiving payment from

2          the end user, and my understanding was that was the

3          primary reason they were not paying us."

4          Ladies and gentlemen, this is an indication from Ms.

5     Prasad based on conversations with debtors and people who owe

6     money like Capax that resellers are not honoring their contract

7     payment terms.  That, you can infer, is evidence of a possible

8     oral side agreement, an accounting irregularity.

9          This is the same evidence that caused Brent Hogenson to

10    elevate his allegations.  Steve Chamberlain in this time period

11    sees the same information and makes a very different choice,

12    certainly than Mr. Hogenson.

13         I'd like to show you this email, which is also quite

14    important.  This is around Exhibit 17291 shows Steve

15    Chamberlain working to manipulate gross margin after the fact

16    in Q4 2010.  We've heard testimony about it.  It's one of three

17    instances in the records that really reveal this.  And I want

18    to pause for a moment and respond to some of the arguments of

19    counsel this morning about this.

20         Ladies and gentlemen, the documents in this case are the

21    bricks.  The testimony is the mortar.  It is -- it

22    contextualizes, but the evidence -- the best evidence of what

23    really happened at Autonomy is in the documents.

24         Why does that matter?  It matters because what the emails

25    show between Mr. Hussain, Dr. Lynch, and Steve Chamberlain are

1    central to a clear understanding of the fraud.  Okay?

2        You did not hear counsel for Dr. Lynch talk about any of

3    those emails yesterday.  You heard Mr. Leach talk for two and a

4    half hours, in which I'm confident he showed you as many as 50,

5    60, 70 of those emails.  That is key evidence, and the

6    documents matter.

7        There's a claim around the BofA deal by counsel for

8    Mr. Chamberlain that it wasn't really falsified.  Okay?  The

9    point is that the date on the document was falsified.  It was

10   typed in.  There is no evidence, based on Lee Welham's

11   testimony, that Deloitte knew that that date had been typed in.

12   Lee Welham was shown that document.  He said that he believed

13   that it was true, and he was -- he had no idea that it had been

14   agreed to after the fact, and if that had happened that would

15   have been relevant.

16       Steve Chamberlain joined Sushovan Hussain at the audit

17   committee meetings.  Those two are sitting there together.

18   That makes Steve Chamberlain very different from Matt Stephan

19   and Poppy Gustafsson and other people in the finance

20   department.

21       Steve Chamberlain is sitting with Sushovan Hussain during

22   the due diligence calls with HP.  That makes him very different

23   from the other people in the finance department.

24       Hewlett Packard gets, you know, from Mr. Apotheker,

25   Autonomy's false and misleading financial statements.  Steve

1    Chamberlain contributed to making those financial statements

2    false and misleading.

3         But the key thing is this email is one of three emails in

4    which Steve Chamberlain is working directly with Sushovan

5    Hussain in order to manipulate after-the-fact gross margin to

6    keep Autonomy's gross margin up even as they are selling a ton

7    of low margin hardware.

8         This is a second example where he was doing it again in Q1

9    2011.

10        When you look closely at that type of evidence, you look

11   closely at what is happening with regard to the manipulation of

12   gross margin after the fact, I submit to you that's exactly

13   what cooking the books really looks like.

14        Let's turn to Dr. Lynch.

15        Dr. Lynch wants you to believe that he was above it all

16   when, in fact, the evidence shows he dominated and controlled

17   Autonomy.  He told a series of lies to the public about

18   Autonomy in order to conceal the ongoing fraud and their secret

19   reliance within Autonomy on the low margin hardware sales.

20        Please pay close attention to what Mike Lynch says within

21   Autonomy, like within the company using the term "Low margin

22   hardware," and what he says about the same topic outside of the

23   company, like calling low margin hardware outside the company

24   an appliance or Arcpliance, which at this point you know means

25   software.  A very, very different thing.

1          The trial record is replete with evidence that Dr. Lynch

2    had total control of Autonomy.  Here are the Deloitte auditors

3    assessing his chief decision making role and where they're

4    really settling on how closely controlled Autonomy is by Dr.

5    Lynch.

6          Dr. Lynch furthered the overall scheme by lying outside of

7    Autonomy about its business and financial performance.  On the

8    left, you see his statement to auditors -- excuse me -- to the

9    analysts and the investors around the Q1 2010 earnings call, in

10   which he is saying:  "What we are not doing is acting as a

11   generic company that resells hardware."  Not a generic company

12   reselling hardware.

13         Later that year to the audit committee Mr. Hussain and

14   Mr. Chamberlain say exactly the opposite thing about Autonomy

15   and what they're doing.  They say:  "The level of sales being

16   made is equivalent to that of a hardware reseller."

17         They do that for the adjustment that they're looking at,

18   at that time.

19         This is the type of disconnect that you see inside and

20   outside routinely, and it's led by Dr. Lynch making false and

21   misleading statements outside of Autonomy.

22         The need for Dr. Lynch to lie outside Autonomy about the

23   low margin hardware grew as Autonomy's dependence on low margin

24   hardware to facilitate its revenue grew over time.

25         Lie number two in the Q1 2010 earnings call, there is a --

1    this is the lie about the inventory.  He says -- Dr. Lynch says

2    "It's not hardware, it's software."

3        And you know that inside Autonomy, based on the evidence

4    that's been submitted in the course of the trial, that the

5    records show that the deferred hardware that was booked as

6    inventory on the balance sheet was all low margin hardware.

7    Steve Brice addressed that in his testimony.

8        The low margin hardware stood out.  It created a real

9    problem in Q1 2010, and it drew analyst scrutiny.  So Dr. Lynch

10   lied and said the inventory was software when it wasn't.

11       Another reason that you know that he knows it's low margin

12   hardware is because he says so.  In this email, in which he is

13   talking about replacing low margin enclosed with high, Dr.

14   Lynch specifically acknowledges that he knows this hardware

15   that becomes the inventory and was deferred is low margin.

16       It's exactly this direction from Dr. Lynch that causes the

17   deferred -- the hardware to be deferred, to be put on the

18   inventory, and it lands on the balance sheet and gets

19   scrutinized by the analysts and has to be lied about by Dr.

20   Lynch.

21       One of the very few emails that counsel yesterday for Dr.

22   Lynch talked about that involved Mr. Hussain and Dr. Lynch was

23   this one.  Counsel did not even put it up on the screen.  He

24   just summarized it for you.  And they didn't show it to you, I

25   submit, for a very good reason.  It's terrible for the defense.

1          This document, when you understand the context in which

2     it's written, shows that Mike Lynch is tracking the arrival of

3     the backdated deal -- Vatican deal two days after the close of

4     the quarter, and he's talking to Sushovan Hussain about if they

5     can get more, meaning more revenue after the quarter ended.

6          And that's exactly what the evidence shows.  That's what

7     they did eventually with the Auxilium group contract, but not

8     before there's a dialogue seven days after the close of the

9     quarter in which they're talking about an entirely different

10    Italian reseller.

11         This Q1 2010 email is Lynch cooking up another Italian

12    reseller, BEE, after the close of the quarter.  BEE team

13    eventually becomes yet another Italian reseller, Auxilium

14    group.

15         You can reasonably infer, ladies and gentlemen, that Dr.

16    Lynch knows about the backdating because he knows about the

17    search for an Italian reseller after the close of the quarter.

18         And that's exactly what happened.  After the close of the

19    quarter the Auxilium deal arrives.  It was backdated, and the

20    hardware is deferred in a fraudulent manner, and it's deferred

21    entirely to inflate gross margins.

22         Lynch told one thing to the auditors about the Q3 2009

23    expenses for the hardware, and he told another thing to the

24    market.

25         Here is the sales and marketing in Q3 2009.  It arrives.

1    There is effectively about $24 million that is being discussed

2    outside Autonomy in the analyst call.  Dr. Lynch says this

3    roughly $24 million was all sales and marketing expense for the

4    launch of the new product SPE.  Inside of Autonomy they say

5    something very different.  They say the $24,000 was all

6    relating to the cost of the hardware in Q3 2009.

7         Outside of Autonomy, Dr. Lynch likes to emphasize that the

8    company is a pure software company.  Inside the company you

9    know, based on the record, that Autonomy sold nearly $200

10   million in low margin hardware between Q1 2009 and Q2 2010.

11        There's nothing that is solely focused on services

12   relating to this disclosure about the financial model.  If you

13   read the highlighted part, it goes straight to this key concept

14   of gross margin:  Autonomy is one of the very rare examples of

15   pure software model.  And then skipping to the portion that's

16   highlighted:  This means that after the cost base has been

17   covered, for every extra dollar of revenue that comes in,

18   significant benefits can fall straight through to the bottom

19   line.  This is all about high margin for software, and you know

20   based on the evidence that they're manipulating that margin

21   number.

22        And finally, there's a lie about involving Oracle.  You

23   heard the testimony of Mr. Kehring.  Effectively Dr. Lynch is

24   saying -- is denying that he met with Oracle.  He's saying that

25   if a bank happened to come with us on a list, that is nothing

```
 1    to do with us, when, in fact, you know, based on the testimony
 2    of Mr. Kehring, that it wasn't a banker with a list.  It was
 3    Dr. Lynch with his investment banker Frank Quattrone meeting
 4    with Oracle.
 5        Now, this lie about the Oracle meeting is ultimately, I
 6    submit to you, not that important, but it does illuminate how
 7    freely Dr. Lynch lies in his public statements.  On and off the
 8    stand, Mike Lynch's credibility is in question.  I submit to
 9    you, you can't believe all the things he says.
10        Let's talk a little bit about Brent Hogenson.  Let's go
11    quickly through an important time line.  The steps really
12    matter here.  First thing that happens with regard to the Brent
13    Hogenson controversy is that Reena Prasad, just doing her job,
14    trying to get collections, detects possible fraud in her call
15    with John Baiocco.  He's not ready to pay because he hasn't
16    been paid.  It's the possibility of an agreement that he
17    doesn't have to do that, notwithstanding the contract terms.
18        Next thing that happens, she alerts Mr. Hogenson.  He
19    begins to pull information together, and he elevates his issues
20    to Dr. Lynch.  Key thing here is that Mr. Hogenson tells Mr. --
21    Dr. Lynch right away:  "The evidence I have gathered suggests
22    members of your senior management team and other employees may
23    have been engaging in seven-and eight-figure transactions with
24    resellers."
25        Key words:  "Your senior management team."
```

1          What happens next?  There was testimony -- testimony from

2     Special Agent Huebsch that at or around this time, Dr. Lynch

3     calls back Mr. Hogenson and asks who he's referring to as

4     senior management.  The testimony that Special Agent Huebsch

5     gave was an admission by Dr. Lynch as follows:  "Then I had a

6     phone conversation with Mr. Hogenson where I asked him which

7     members of management he was referring to, and he told me

8     Mr. Hussain and Mr. Egan."

9          Next step.

10          In Exhibit 884, Dr. Lynch's response to Brent Hogenson, he

11     says something important.  He says -- almost immediately in the

12     conversation Dr. Lynch tells Mr. Hogenson:  "I would like to

13     avoid involving Sushovan and the rest of the finance team."  He

14     backs Mr. Hogenson off about saying anything further about

15     Mr. Hussain.

16          And he then warns him:  "I would ask that until you have

17     performed the next step, that the language you use is a little

18     bit more moderate as until we confirm your concerns are valid

19     and not just an artifact of partial information.  I would not

20     want to inadvertently run the risk of accusing the innocent as

21     emails have been known to escape."

22          That's important.  What is Dr. Lynch doing?  He's backing

23     Brent Hogenson off about naming or further naming Sushovan

24     Hussain:  Might be defamation.  Be careful.  Don't talk about

25     him.  I'll look into it now.  That's the thrust.

1    What happens next?  What happens next is Dr. Lynch reaches

2    out to the audit committee and doesn't provide that information

3    to them.  Dr. Lynch knew that Brent Hogenson had implicated

4    Sushovan Hussain and Stouffer Egan, but Lynch is now protecting

5    Sushovan Hussain and preventing any further sort of evaluation

6    of what Mr. Hussain's role was and, in so doing, preventing any

7    further discovery or any possible discovery of the fraud that

8    had been going on.

9         This was a document that was introduced in

10   cross-examination.

11        What's next in the sequence I think is quite important.

12   Andy Kanter calls Joel Scott in or around this time and tells

13   him something that I think is quite important and then is

14   corroborated by Dr. Lynch.

15        This is a testimony of Joel Scott:

16        "QUESTION:  Let's take the conversation with

17        Mr. Kanter first in which he describes Mr. Hogenson as

18        dangerous.

19        "In any way did Mr. Kanter say Mr. Hogenson was

20        dangerous because he failed to properly supervise the

21        payroll department?

22        "ANSWER:  No, it was -- he's dangerous because he's

23        trying to sabotage the company."

24   Trying to sabotage the company.  That's one of the first

25   things Andy Kanter says to Joel Scott about what's going on

with Brent Hogenson.

This doesn't have anything to do with the payroll fraud. It has everything to do with someone who is raising core allegations about a possible accounting fraud at Autonomy.  And that's corroborated, that language, that type of language is corroborated by what Mr. Scott recounts about his conversation with Dr. Lynch.

Mr. Scott testified as follows:

"QUESTION:  So when I shared with Mike that I was going to meet with Brent and walk through the issues, Mike shared with me, he reiterated:  Joel, this is your call. You're the one running this.  If it were me, I wouldn't want somebody in the company that was trying to destroy the company.  I'd want him out as quickly as possible."

That's what Joel Scott told you Mike Lynch told him: Someone who's trying to destroy the company.

How is someone who is paying invoices that need to be paid but without the authorization of the U.K. trying to destroy the company?  Please struggle with that question, because I think it illuminates what's really going on with regard to Dr. Lynch and Brent Hogenson.

What happens next?  Joel Scott told you that there was an investigation by Kroll of the payroll fraud, and in his testimony:

"QUESTION:  What, if anything, did you find?"  Was

1          the question that was asked of him.

2          By Mr. Scott:

3                "ANSWER:  Nothing.

4                "QUESTION:  And in connection with the investigation

5          was there nothing connecting Mr. Hogenson to the payroll

6          fraud, according to Kroll's work?

7                "ANSWER:  Correct."

8          Mr. Scott is eventually asked do you think Mr. Hogenson

9   was treated fairly?  I'm confident some, I hope all of you,

10  remember that testimony.

11         Mr. Scott said the following about that:

12               "QUESTION:  Mr. Scott, do you think Brent Hogenson

13          was treated fairly by Autonomy?

14               "ANSWER:  No.

15               "QUESTION:  Why not?

16               "ANSWER:  As I sit here today I think that there --

17          there was certainly legitimate questions that he raised.

18          My perception was, there wasn't any interest that there --

19          my perception was that there was less a focus on getting

20          to the actual substance of the allegations and making sure

21          that, you know, we got it all right, and more about

22          identifying Brent as a problem and somebody That needs to

23          get out, be out of Autonomy."

24         That distills a lot of what was going on with regard to

25  the Brent Hogenson investigation and the motivations of Dr.

```
 1   Lynch and others within Autonomy to get rid of him.  He was not
 2   treated fairly based on this trial record.
 3        Do you think that Brent Hogenson was fired for not seeking
 4   U.K. approval to pay invoices that were due?  No way.  Brent
 5   Hogenson was fired for raising accounting issues that would
 6   have destroyed Mike Lynch and his company.  They're the very
 7   accounting issues that have been the topic of this trial.
 8        Soon after Mr. Hogenson was fired, Reena Prasad and Percy
 9   Tejeda were both fired.  You could reasonably infer under
10   the -- on this record that they were fired just for having
11   worked with him.
12        Brent Hogenson files a complaint with the FSA.  He files a
13   complaint with the United States Securities and Exchange
14   Commission.  Autonomy then pays Brent Hogenson $750,000,
15   according to Joel Scott the largest settlement of its type that
16   he had after seen Autonomy do.
17        If he was not -- I submit to you, based on this record,
18   that if Brent Hogenson was not destroyed, Brent Hogenson would
19   have blown the lid on the fraud that was happening in 2010, a
20   year before they were able to carry out that fraud with regard
21   to HP, and that Mike Lynch needed to and did destroy Brent
22   Hogenson for that reason.
23        Let's turn to the blame-the-victim defense relating to HP.
24   I submit to you HP would not have bought Autonomy if it knew
25   the financial statements were materially fraudulent, false and
```

misleading or if they knew about the scale of the low margin
hardware sales.

    Leo Apotheker made that very point:

    "QUESTION:  Prior to August 18th, 2011, if Autonomy's
2009 and 2010 financial statements were materially false
and misleading, would that have been relevant to you?"
Answer by Mr. Apotheker:

    "ANSWER:  It would have been hugely relevant to me.

    "QUESTION:  Why would it have been hugely relevant to
you?

    "ANSWER:  Well, assuming they would have been false
and misleading, just to start off with, if they are false
and misleading I would have had no trust in management
because management is not supposed to issue false and
misleading statements.  Equally importantly, that would
have meant that the whole picture that we had drawn in our
minds and all the financial assumptions that we had made
on Autonomy would have been wrong, that we would have been
looking at a completely different company, different
profile."

    I submit to you that HP asked Autonomy the right questions
and Autonomy gave HP the wrong answers.

    One of the questions was around OEMs.  This document shows
what Mr. Hussain and Dr. Lynch understand to be the correct
OEMs for Autonomy.  FileTek is listed here.  When you go to the

list that was provided to HP, FileTek is not listed there.

Again, you have an inside, outside.  Inside the coconspirators discuss what's really going on.  Outside they say something very different.  And if they had disclosed that FileTek was an OEM, I guarantee you that would have, based on this trial record and the evidence you've heard, would have raised a real red flag.

Yesterday we heard a bunch of -- or certainly an assertion that Autonomy had somehow told HP about hardware.  I submit to you -- and there was a list given of eight different things.  Quickly put it together, I submit to you that when you really look at each of these eight things, there are questions about whether that is actually a disclosure of hardware.  One of the ways they're allegedly told, HP is told is that it was an appliance.  Well, at this point you know appliances are not hardware, they're software.  They're hardware with software on it.

Packaged solutions, same thing.  Hardware packaged with software.

Inventory, the inventory disclosure.  According to Dr. Lynch, all the inventory disclosure was Arcpliance, which, again, is software.

In the data room it contains a UBS hardware contract.  Well, if you look at that contract, which is in evidence, it is about software with a mix of hardware.

1    There was the allegation that HP would know about all the

2 hardware because of some of the hardware HP sold to Autonomy.

3 Well, that's only $2 million.  That's a tiny fraction of the

4 $100 million that Autonomy was selling.

5    Scale matters here.  Of course a small hardware contract

6 isn't relevant, but the scale of what Autonomy was doing is

7 relevant.

8    Letters to Dr. Lynch's attorneys is not disclosure to HP

9 about the hardware.  That didn't get to HP, based on this

10 record.  And Dr. Lynch says he told Shane Robison.  But in

11 order for you to conclude that, you gotta take Dr. Lynch's word

12 for it.

13    Okay.  HP's only real mistake, when you really get to the

14 bottom of it all, was to believe what the defendants said.

15    There's also been a claim that HP was going to get all of

16 Autonomy's business records and that even if they had intended

17 to defraud them, that that circumstance would -- what? --

18 subvert the likelihood of any of the defendants actually

19 believing that.

20    The bottom line is, there was a sweeping of all the VAR

21 documents, all the VAR deals under the rug in the period

22 immediately around the earnings -- the acquisition announcement

23 in August 2011.  You heard testimony about that from Joel

24 Scott.  You saw all the credit memos.  You see the cancellation

25 of documents.  They're cleaning things up before the deal

1    closes.

2         You've heard testimony that Dr. Lynch is going to be

3    running Autonomy as an independent unit within HP with his

4    team, with all of his people around him.  And that's one other

5    way to insulate HP from anything that they might otherwise

6    discover.

7         And at the end of the day, what you also know is at the

8    time of the acquisition, good, bad or indifferent, HP is stuck

9    with Autonomy.  There's no going back.

10        And I think for those reasons some of the claims that

11   somehow, you know, HP was going to -- if Autonomy was worried

12   about HP learning about all the fraud, why would they ever

13   sell, well, all of those, in some ways, I think contradict that

14   claim around the circumstances of what the acquisition was

15   really going to yield.

16        Yesterday we heard quickly about the:  No one knows what

17   HP asked for defense.  I'll just show you quickly Exhibit 2146.

18   HP asked for copies of the top ten 40 customer contracts by

19   revenue.  That's a pretty simple question.  That's not hard to

20   understand, and it's not ambiguous.  And the defense is

21   inviting speculation by you about some alteration.  Here it's

22   in black and white:  Top 40 customers by revenue.  Not hard to

23   do, and that's exactly not what happened.

24        Same difference for a list of the top 40 customers by

25   revenue.  Again, not ambiguous, not complicated, not difficult.

```
 1    Invitations to suggest something else are invitations to
 2    speculate.  Don't speculate.  You have solid evidence of
 3    exactly what HP asked for, and on this trial record I think you
 4    have evidence of exactly what they didn't get.
 5        You also heard yesterday what I think was an unusual,
 6    certainly from me, surprising defense:  The don't use your
 7    common sense defense.  It was an invitation somehow for you as
 8    jurors not to use your common sense.  I find that baffling.
 9        The Court has specifically instructed you to use your
10    common sense.  It's one of the most important things you have,
11    your judgment, your experiences, your common sense about
12    what -- how you lead your lives, how you assess what did and
13    didn't happen in your daily lives.  That's critical.  That's
14    going to be critical to you.  I don't know why a suggestion
15    would be made that you shouldn't use that.  And the Court has
16    specifically told you, you must use that, and certainly in
17    deciding reasonable doubt.
18        And I think common sense becomes critical in this case
19    around core questions like following the money.  Does it really
20    make sense for Autonomy to constantly pay for revenue in the
21    manner that it did?  You assess that using common sense.
22        Does it make sense for you to not use your common sense to
23    assess people who are saying one thing and do another?  No.
24    How else are you supposed to do that?  You need to use your
25    everyday judgments, same judgments you bring into your lives
```

```
1    about whether you believe someone and whether it makes sense.
2         So at the end of the day one of your most important
3    functions is to weigh the credibility of witnesses, to assess
4    their bias, and I submit you must do that using your common
5    sense and good judgment.
6         Okay.  Just about done.  Three quick topics.
7         Motive.  Why did the defendants commit these crimes?  It's
8    not an element of any of the offenses, but understanding why
9    the defendants did what they did takes us, I submit to you, to
10   the truth of the matter.
11        For Steve Chamberlain the answer seems clear.  By 2010 he
12   latched himself, good, bad or indifferent, to Mr. Hussain and
13   to Dr. Lynch.  Steve Chamberlain saw the same problems, had the
14   same concerns, expressed the same misgivings as Matt Stephan,
15   but Steve Chamberlain made a very different choice, and by 2011
16   that choice paid off for him to the tune of $4.1 million.
17   Okay?
18        Mike Lynch's motive is more multilayered.  Although he was
19   already rich, Lynch's payout was a cool 780 million.  The 500
20   million figure was a pounds figure.  That's a lot of
21   motivation, ladies and gentlemen, I submit to you.
22        But a little bit more deeply, aspects of the trial record
23   suggest that Mike Lynch was -- what? -- an overambitious
24   corporate chieftain who thought he was smarter than everyone
25   else and for whom the same rules did not really apply.
```

1     That he was a type of corporate boss who met critique with

2     attack and fury, as he showed in his dealings with Daud Khan,

3     Harald Collet and Marc Geall and especially, I submit to you,

4     Brent Hogenson.  After all, in the London Times article it was

5     Mike Lynch who compared Autonomy to a piranha.

6     So I'm going to leave it to you to make a final assessment

7     of why Mike Lynch committed these crimes, but I submit to you,

8     you have a lot to work with.

9     Now, there's been emphasis given to the good faith

10    instruction.  The Court has instructed you on how you should

11    evaluate the law of good faith, and this is an important

12    instruction.  We -- the Government urges you to consider it

13    carefully.  And when you do, I suggest that you ask the

14    following questions:  Was it good faith for Steve Chamberlain

15    to tell Joel Scott he would let the auditors know about the

16    $3.5 million deal involving DiscoverTech BofA, let them know

17    that it was backdated, and then not tell the auditors about it?

18    That's what Joel Scott told you on the witness stand.  Okay?

19    Was it good faith to later suggest that -- to Joel Scott

20    that Steve Chamberlain had been transparent with the auditors

21    when Lee Welham testified that that never happened?

22    Was it good faith to phony up any of those proforma

23    invoices suggesting delivery when the delivery hadn't really

24    happened?

25    For Mike Lynch, my questions to you are was it good faith

to lie to the analysts about the inventory, saying it was

Arcpliance when it was really low margin hardware?

Was it good faith to work with Steve Chamberlain and

Sushovan Hussain to manipulate Autonomy's gross margin after

the fact in Q1 2010 and then again in Q1 2011?

Was it good faith for Mike Lynch to mislead the market and

then HP about Autonomy's low margin hardware sales again and

again and again?

No.  I suggest to you that these lies, these deceptions,

were not good faith.

Every one of you have met people who say one thing and do

another.  At bottom, this case is no different.  The defendants

were saying one thing inside Autonomy and saying something

quite different outside Autonomy to the auditors, to the

investors, and ultimately to HP.

The witnesses from HP told you that if they had known that

Autonomy's financial statements were materially false and

misleading, they would never have bought Autonomy.  Okay?  And

that makes sense.  Who wants to buy a company that may be rife

with fraud?  No one does.

Aided by Steve Chamberlain, Mike Lynch led a conspiracy

that falsified Autonomy's financial statements again and again.

No doubt about it.

The defendants acted with criminal intent because they

lied to the auditors, the market, and HP's executives about

1   Autonomy's products and performance.  No doubt about it.

2       Those falsehoods went straight to HP's valuation of the

3   deal and the price HP was willing to pay.

4       Ladies and gentlemen, when you peel back the layers and

5   cut through the jargon, the evidence shows that the defendants

6   came into the Northern District of California, flaunted

7   Autonomy's false growth story, and walked away with millions of

8   dollars, and that's a crime.

9       In a few minutes this case is going to be yours.  I think

10  I speak for all the counsel in this case.  Thank you for your

11  long and patient service.  No one's ever been late.  I don't

12  think any of you fell asleep, so that's really a remarkable,

13  remarkable accomplishment.

14      Please enjoy the moment that is just about to come when

15  you can finally, as a group, discuss the facts of this case.

16  When that happens, work together.  Give and share your views of

17  the evidence.  Use the life perspective, common sense, that

18  each of you brings to your jury service to form a collective

19  judgment of what really happened in this case.  If you do that,

20  we are confident that you will return a verdict of guilty on

21  all counts.

22      Thank you very much.

23          **THE COURT:**  Ladies and gentlemen, when you begin your

24  deliberations, elect one member of the jury as your foreperson

25  who will preside over the deliberations and speak for you here

1    in court.

2        You will then discuss the case with your fellow jurors to

3    reach agreement, if you can do so.  Your verdict, whether

4    guilty or not guilty, must be unanimous.

5        Each of you must decide the case for yourself, but you

6    should do so only after you have considered all the evidence,

7    discussed it fully with the other jurors, and listened to the

8    views of your fellow jurors.

9        Do not be afraid to change your opinion if the discussion

10   persuades you that you should.  But do not come to a decision

11   simply because other jurors think it is right.

12       It is important that you attempt to reach a unanimous

13   verdict, but of course only if each of you can do so after

14   having made your own conscientious decision.  Do not change an

15   honest belief about the weight and effect of the evidence

16   simply to reach a verdict.

17       Perform these duties fairly and impartially.  Do not allow

18   personal likes or dislikes, sympathy, prejudice, fear or public

19   opinion influence you.

20       You should not be influenced by any person's race, color,

21   religion, national ancestry, gender, profession, occupation,

22   economic circumstances or position in life or in the community.

23       It is your duty to consult with one another and to

24   deliberate with one another with a view towards reaching an

25   agreement, if you can do so.

1      During your deliberations, you should not hesitate to

2  reexamine your own views and change your opinion if you become

3  persuaded that it is wrong.

4      Because you must base your verdict only on the evidence

5  received in the case and on these instructions, I remind you

6  that you must not be exposed to other information about the

7  case or the issues it involves.

8      Except for discussing the case with your fellow jurors

9  during your deliberations, do not communicate with anyone in

10  any way, and do not let anyone else communicate with you in any

11  way about the merits of the case or anything to do with it.

12  This includes discussing the case in person, in writing, by

13  phone or electronic means, via email, text messaging or any

14  Internet chat rooms, blog, website or other features.  This

15  applies to communicating with your family members, your

16  employer, the media or press, and the people involved in the

17  trial.

18      If you are asked or approached in any way about your jury

19  service or anything about this case, you must respond that you

20  have been ordered not to discuss the matter and to report the

21  contact to the Court.

22      Do not read, watch, listen to any news or media accounts

23  or commentary about the case or anything to do with it.

24      Do not do any research, such as consulting dictionaries,

25  searching the Internet or using other reference materials and

1    do not make any investigation or in any other way try to learn

2    about the case on your own.

3        The law requires these instructions and restrictions to

4    ensure that parties have a fair trial based on the same

5    evidence that each party has had the opportunity to address.

6        A juror who violates these restrictions jeopardizes the

7    fairness of these proceedings and a mistrial could result that

8    would require the entire process to start over.

9        If any juror is exposed to any outside information, please

10   notify the Court immediately.

11       Some of you, in fact many of you, have taken notes during

12   the trial.  Whether or not you took notes, you should rely on

13   your own memory of what was said.  Notes are only to assist

14   your memory.  You should not be overly influenced by your notes

15   or those of your fellow jurors.

16       The punishment provided by law for this crime is for the

17   Court to decide.  You may not consider punishment in deciding

18   whether the Government has proved its case against the

19   defendant beyond a reasonable doubt.

20       A verdict form has been prepared for you.  After you have

21   reached unanimous agreement on a verdict, your foreperson

22   should complete the verdict form according to your

23   deliberations, sign it and date it, and advise the clerk that

24   you are ready to return to the courtroom.

25       The verdict form, as you will see when you retire, lists

1    each count.  And then for each count it has each defendant, and

2    then it has a column, guilty or not guilty, and that's how you

3    fill out form.  I think it's pretty self-explanatory.

4         If it becomes necessary during your deliberations to

5    communicate with me, you may send a note through the clerk

6    signed by your foreperson or by one or more members of the

7    jury.  No member of the jury should ever attempt to communicate

8    with me except by a signed writing.  And I will respond to the

9    jury concerning the case only in writing or here in open court.

10        If you send out a question, I will consult with the

11    lawyers before answering it, which may take some time.  You may

12    continue your deliberations while waiting for the answer to any

13    question.

14        Remember, you are not to tell anyone, including me, how

15    the jury stands, numerically or otherwise, on any questions

16    submitted to you, including the question of the guilt of either

17    defendant until after you have reached a unanimous verdict or

18    have been discharged.

19        With that, ladies and gentlemen, Ms. Scott will take you

20    back to the jury room.  I know that lunch is awaiting you, and

21    I would ask the alternate to remain in the courtroom for a

22    moment.

23             (Proceedings heard outside the presence of the jury:)

24             **THE COURT:**  Okay.  Let me address you before -- before

25    you depart.

1          First of all, I want to thank you very much for your

2     service, and I want to also tell you it may be necessary for

3     you to participate in deliberations.  It's happened, in my

4     experience, a number of times.  And for that reason, I'm

5     instructing you not to discuss the case and also to provide

6     Ms. Scott with a way to reach you, if necessary.

7          And also, I want to tell you that in the event you are

8     called into deliberations, the jury is instructed that they are

9     to start anew their deliberations so you're not at any

10    disadvantage in terms of any decisions that have been made.

11         So, again, I want to thank you.  In the event we don't

12    need your further service, Ms. Scott will contact you and

13    advise you of that fact.  Again, many thanks.

14              (Alternate juror exits the courtroom.)

15         **THE COURT:**  Okay.  The jury has retired.

16    Mr. Lincenberg?

17         **MR. LINCENBERG:**  Thank you, Your Honor.

18         Two things.

19         **THE COURT:**  Yes.

20         **MR. LINCENBERG:**  First, I wanted to make a record.  I

21    did not want to interrupt Mr. Reeves' eloquent rebuttal, but

22    there are three statements he made that were factually

23    misleading.  The first is that he falsely suggested that

24    altered EMC invoice --

25         **THE COURT:**  I'm sorry, what?  That?

1          **MR. LINCENBERG:**  The first is that Mr. Reeves falsely

2    suggested that altered EMC invoices were provided to Deloitte.

3    Zero evidence of that.

4        Second, Mr. Reeves used a slide that falsely said that

5    Mr. Chamberlain passed Autonomy's lies to the auditors

6    referencing phony proforma invoices, contrary to all of the

7    evidence.

8        And third, he said was it good faith to phony up invoices

9    falsely suggesting that Mr. Chamberlain did so, provided

10   falsely doctored up invoices to Deloitte.  So I wanted to raise

11   those three points and then I wanted to make sure the record

12   was clear that we renew our Rule 29 motion.

13         **THE COURT:**  Right.  Okay.

14       You don't have to renew it.  I think I took it under

15   submission.

16         **MR. LINCENBERG:**  Right.

17         **THE COURT:**  And I will rule on it.  I mean, you can

18   ask now, but I'm going to rule upon it later.  Okay.

19         **MR. HEBERLIG:**  May I ask?

20         **THE COURT:**  Mr. Heberlig, yes.  Go ahead.

21         **MR. HEBERLIG:**  I just wanted to make a brief record.

22         **THE COURT:**  Sure.

23         **MR. HEBERLIG:**  We object to the reasonable doubt

24   instruction that was given after Mr. Lincenberg's argument.  I

25   don't know that there's anything to do about it now, but the

```
1   Court didn't read the first two sentences of the reasonable

2   doubt instruction, which, in our view, are the critical

3   sentences that state:  Proof beyond a reasonable doubt is proof

4   that leaves you firmly convinced that the defendant is guilty.

5   It does not require that the Government prove guilty beyond all

6   possible doubt.  Those were omitted from the Court's

7   instruction.  Really my position is just twofold.  We'd just

8   object that it was done at all and the way it was done --

9        THE COURT:  I'm sorry, but you understand what I was

10  talking about was not the burden of proof at all, which is what

11  you've just alluded to.  It was not that.  It was the

12  definition of what a reasonable doubt is.  I mean, if we're

13  going to have this exchange, we're going to have an honest

14  exchange about it.

15       MR. HEBERLIG:  I'm happy to.

16       THE COURT:  That's what I said.  It was -- the jury

17  was given an example of what reasonable doubt is, not burden of

18  proof, not convinced beyond a reasonable doubt, none of that.

19  I had no objection to any of that, so I -- I focused my oral

20  remarks -- of course it's, indeed, they get a copy of the

21  entire instruction and this morning -- I mean yesterday I read

22  the entire instruction, so I'm now responding to your point.

23  And you can object.  I don't -- I don't -- obviously you can

24  object.

25       MR. HEBERLIG:  Obviously.  Fortunately, the written
```

```
 1    instructions go back to them.  My objection was really twofold.
 2    I don't think it was warranted in light of Mr. Lincenberg's
 3    argument that we didn't make and I think unduly sort of was
 4    suggestive to the jury but also I maintain my objection for the
 5    record and, like Mr. Lincenberg, do respectfully renew our Rule
 6    29 objection as well.
 7             THE COURT:  Okay.  That's fine.  Thank you very much.
 8        Okay.  I mean, you don't have to respond now.  I mean,
 9    look, I'm not -- and I'm not commenting on the merits of your
10    objection.  They may be -- they may be well founded, they may
11    not, I have just no idea.  But I certainly wouldn't bring the
12    jury in -- had you objected at the time, I would have said what
13    I always say is that argument is not evidence, lawyers can
14    represent the evidence as they saw it; however, it's how the
15    jury finds it to be, and I don't know whether I'd say any more
16    than that.  So I don't -- I think your objection is timely --
17    okay? -- not concerned about that because what I would have
18    given would not have been a curative instruction, it would have
19    been a boilerplate instruction that I give on occasion.
20        However, let's see what happens and then you've made your
21    objection for the record, which I think is entirely proper and
22    we'll just take it from there.
23        So anyway, in case the jury wants, you know, one or two of
24    the exhibits, I hope you have reached some agreement with
25    Ms. Scott as to how the somewhere between 1 and 10,000 exhibits
```

```
 1   will --

 2         MR. LINCENBERG:  We were able to reach agreements with

 3   the prosecutors, but Ms. Scott was very obstinate.

 4         (Laughter.)

 5         THE COURT:  Well, that's fine.  And I want to say, I

 6   mean, before we go to the jury, this has been a model of

 7   cooperation and civility between the defense and the

 8   prosecution, and this case has taken 11 weeks, we're now in the

 9   12th week.  Of course there are differences of opinion and of

10   course it's genuinely felt by the individuals expressing their

11   views.  I have -- but I'm marveled, indeed, the task of having

12   a trial, which the Court hopes was fair, would have been

13   nearly -- it would have been extraordinarily difficult had the

14   lawyers not treated each other with civility and respect and

15   been genuinely concerned about moving the case along in a fair

16   manner, so I want to -- I want to thank the lawyers personally

17   and professionally for that.

18        I don't think -- you know, it's hard to project, but I

19   don't think that the -- I have no idea what the outcome is

20   going to be and I have no idea that I would say anything about

21   it other than -- other than that I think that by the means of

22   which you presented evidence, presented arguments, treated each

23   other, was a major contribution to our system of resolving

24   criminal disputes and I want to thank you.

25         MR. LINCENBERG:  Well, it's also a major contribution
```

1    to have somebody like Your Honor to try this case.  This is not

2    an easy one for the Court.  You're making decisions as we go

3    along.

4            **THE COURT:**  Yes, but you see, that's my job.  You

5    don't have to -- you know, people say, well, what about judges,

6    that they get -- you know, they're this and that and so forth,

7    but that's what we do and it's fine and there are -- the

8    consequences of making a wrong decision are that there are

9    courts to correct those errors, but it was this kind of

10   experience where I see really good lawyering, really good

11   advocacy, young people come up and learn through the process.

12   And I appreciate that and I appreciate on both sides the lead

13   lawyers encouraged their colleagues to participate in that and

14   take the slings and missiles of a judge saying don't ask the

15   question that way or don't you mean this or don't you mean

16   that, which, of course, you know, it's part of the process.

17   It's part of the toughening process, but it's a very valuable

18   experience.  It's very valuable that the Court sees younger

19   lawyers who haven't practiced 37 years come aboard and take on

20   an important -- important role in the presentation.

21        Anyway, who knows how long we'll be here, but we'll be

22   here.

23           **MR. LINCENBERG:**  Judge --

24           **THE COURT:**  Yeah.

25           **MR. LINCENBERG:**  -- in terms of availability, we're

 1  going to be around here this afternoon, but I'm wondering what

 2  the Court's practice is if we can be, for example, within 15

 3  minutes or what -- what --

 4         THE COURT:  Well, I -- here's the thing:

 5      When a note comes out, you know, we immediately -- we need

 6  your input, so I think you have to be in the courthouse.

 7         MR. HEBERLIG:  Okay.

 8         THE COURT:  You know, there are places to be.  Stay

 9  out of cafeteria.  I don't know, there's some type of illness.

10  Anyway, I'll get in trouble now with GSA and the cafeteria

11  people, but I'd say around -- I think that what -- as soon as

12  I -- sometimes they'll say to Ms. Scott we want to leave at

13  4:00 or we want to leave at 5:00 or we want to leave at 3:30 or

14  something like that and unless it's sort of shocking, like

15  we'll see you tomorrow now, I let them dictate it.  But I did

16  tell them, though I didn't want to remind them because I

17  didn't -- this is not the time necessarily to do it -- that

18  they'll be meeting on Friday.  It is my intention to have them

19  meet on Friday if they are still in the deliberative process

20  because I know that one juror told us 18th of June.  Is that

21  it?  18th of June.  14th of June.

22         MR. LINCENBERG:  14th.

23         THE COURT:  14th of June.  I have it right here.

24  Yeah.  14th of June.

25      So obviously if we get another day of deliberation Friday,

1    that would be -- that would be useful.

2        And also I instruct them not to commence deliberations

3    until all 12 are present.  So as they wander in, in the

4    morning -- I don't bring them into court, but I will tell them

5    they cannot begin deliberations until all 12 are present.

6        And I think that's it.

7            **MR. LINCENBERG:**  Thank you, Your Honor.

8            **THE COURT:**  Okay.

9            **MR. REEVES:**  Thank you, Your Honor.

10           (Adjourned at 1:06 p.m.)

11                         --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES COURT REPORTERS**

1

2

3                        **CERTIFICATE OF REPORTERS**

4          We certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7

8    Dated:  June 4, 2024

9

10

11

12   RHONDA AQUILINA, RMR, CRR
     Official Court Reporter
13   CA CSR# 9956

14

15

16

17   JENNIFER L. COULTHARD, RMR, CRR
     Official Court Reporter
18   CA CSR#14457

19

20

21

22

23

24

25